Argued 29 July; decided 25 August, 1902.

### SALEM MILLS CO. v. LORD.

[69 Pac. 1033; 70 Pac. 832.]

PARTIES OF RECORD—ACTION AGAINST STATE.

1. When jurisdiction is questioned on the ground that the proceeding is really against a state, the court will look behind the nominal parties to the record and ascertain the real parties to the controversy, dismissing the action if it is really against the state, and retaining jurisdiction if it is not.

ACTIONS AGAINST STATE OFFICERS—CONCLUSIVENESS OF RECORD.

2. Where the record in a suit against state officers does not show that the state is an interested and indispensable party, or that the subject of controversy is in its exclusive possession, and it cannot be ascertained without a trial whether such officers did or are doing the acts complained of officially or as individuals, the jurisdiction of the court cannot be ousted by a mere suggestion that the state is the real party interested.

LIABILITY OF STATE OFFICERS FOR UNLAWFUL ACTS.

3. Public officials cannot escape liability for appropriating property to which the state has no title, on the ground that they were acting under authority of the state, for the state cannot authorize them to exercise any dominion over property not its own, except through some recognized process of law, any more than an individual can.

NATURE OF THE SUIT IN QUESTION—SPECIFIC PERFORMANCE.

4. A suit against officers of a state to restrain them from using more water from a certain stream than is granted under a certain contract between the riparian owners and the state is not a suit against the state, nor is it a suit for the specific performance of a contract.

LIMIT OF RIPARIAN RIGHT TO USE WATER.

5. Whatever may be the territorial limitation on the right of a riparian proprietor to use the water flowing past his land, it does not extend so far as to authorize an appropriation from the stream of sufficient water to supply the irrigation, domestic, culinary and sanitary requirements of a farm and an establishment containing over a thousand people, and situated more than a quarter of a mile from the stream.

ESTOPPEL BY CONDUCT—FACTS IN QUESTION.

6. The facts claimed to constitute an estoppel on the plaintiff are examined and *held* not to affect the right to assert any claims that plaintiff may have.

EVIDENCE OF PRESCRIPTIVE USE OF WATER.

7. Plaintiff's predecessor in title granted to the state as much water as could be pumped through a two-inch pipe. The state, however, laid a four-inch

pipe, which was thereafter replaced with a six-inch one, the laying of the latter being done without any attempt at concealment, both pipes having been laid more than ten years prior to the suit. The pumps supplying the pipes were capable of throwing more water than a two-inch pipe could carry, but the amount actually thrown depended on the speed of the engines, and the only positive evidence of any excessive use of water during the ten years preceding the suit was that about six years previous some excess was being used. The uses to which the water was applied probably required more than the grant allowed, but were such that no definite estimate could be made therefrom. No effort was made to conceal the amount used, but the means of supplying the pumps were totally concealed from ordinary observation, and as soon as plaintiff discovered that an excess was being used it promptly made objections, which were continued until it brought suit. *Held,* that the evidence did not show the notorious user for ten years of a definite excess of water necessary to establish a prescriptive right to such excess.

MEASURE OF A PRESCRIPTIVE RIGHT.

8. The extent of a right gained by prescription is always measured by the extent of the use and enjoyment for the full period required by the statute of limitations, and the right claimed must be clearly defined.

From Marion: REUBEN P. BOISE, Judge.

Suit for an injunction by the Salem Flouring Mills Company against William P. Lord, Governor of Oregon, and other state officers and agents. The Willamette Woolen Manufacturing Company was incorporated by an act of the Legislative Assembly of the Territory of Oregon, December 17, 1856 (Laws 1856-57, p. 48), with power, among others enumerated, "to bring water from the Santiam River to any place or places in or near Salem, to be brought as far as possible through the channel or valley of Mill Creek," and was given "the exclusive right to the hydraulic powers and privileges created by the water which it takes from the Santiam River, and may use, rent, or sell the same, or any portion thereof, as it may deem expedient." In pursuance of its charter, this company constructed in 1857·a canal from a point on the right bank of the Santiam River to a connection with Mill Creek, and by means thereof, and the channel of Mill Creek, enlarged and improved where needed, conducted a large volume of water from the Santiam River to the City of Salem. About the same time the company acquired real property adjacent to Mill Creek near its confluence with the Willamette River, within the city, erected a woolen mill and a sash and door factory thereon, and utilized the water to operate the same. These industries, how-

ever, have been discontinued. Later, the company acquired another tract of land, near the junction of South Mill Creek with the Willamette River, erected a flouring mill thereon, and conducted water thereto for its operation by means of a race constructed for the purpose and intersecting Mill Creek about a mile east of the mill, at what is known as the "Waller Dam." By means of this dam the water from Mill Creek was intended to be divided into two equal parts. This company disposed of certain water powers and privileges upon the race, to which the Thomas Kay Woolen Mills Company and the Salem Water Company have succeeded, and by deed of March 7, 1865, granted to the State of Oregon certain other rights and privileges, on conditions following:

"All the right, title, and interest of said company in and to the water power on Mill Creek, where said creek passes through the land of M. L. Savage in the County of Marion, State of Oregon, together with the right which said company has under and by virtue of its charter to bring water through the land of Frederick Yenkee, in said county, adjacent to the land of said Savage, so that the said water may be used to the best advantage at such point on or near Mill Creek on the land of said Savage as the said State of Oregon or its assigns may select to use the same as a water power. It is expressly understood, however, that in case the said water is brought across the land of the said Yenkee, it shall be confined to a race or narrow channel, so as to prevent all unnecessary waste of water, and that said state or its assigns shall pay all damage which it may cause in bringing said water. It is further expressly understood that the right hereby conveyed does not include the right to use said water for the purposes of irrigation, or in any other way or for any other purpose than running machinery and for mechanical purposes, except that said state may use for such other purposes as it may choose such an amount of water as it can pump through a pipe not exceeding two inches in diameter; all other water which said state may use by virtue of this conveyance to be returned to Mill Creek on the land of said Savage without unnecessary waste. It is expressly understood that said company has reserved and hereby doth reserve the right to take from the flume or penstock, which the said state or its assigns may construct for the purpose of using said water power, any amount of water it may choose to take, not

exceeding what can be conveyed through a pipe six inches in diameter, and for the purpose of taking such water from said flume or penstock the said company is to have the right of way across any land which said state may purchase from said Savage for laying a pipe and maintaining the same for conveying said water. This instrument is not to be so construed as to restrict the said State of Oregon in any right to the use of said water which said state may have or acquire by virtue of ownership of the land along Mill Creek.''

To all other rights and privileges acquired by virtue of such legislative grant, and the construction and maintenance of such canal and water way, the plaintiff has succeeded. Below the Waller Dam the water is being utilized principally along the race and at the flouring mill for manufacturing purposes, propelling machinery, and the like, but the plaintiff is the owner of different parcels of realty, including the old woolen mill and sash and door factory sites, adjacent to and so situated that the water from South Mill Creek may be so utilized thereon, and are therefore of great value, although little, if any, water is now being used for such purposes from that source. On March 22, 1865, Morgan L. Savage and wife conveyed to the State of Oregon a tract of land, situated a quarter of a mile or more east of and above the Waller Dam, containing 147 acres, the southern portion of which is intersected by the natural channel of Mill Creek. The conveyance comprises ''all the right, title, interest, claim, and privilege to the water and water power of Mill Creek, where said creek passes through or by the land of said Savage, party of the first part, and the whole estate which the said parties of the first part have, own, and possess, of, in, or to the said described premises and privileges,'' but reserves the right of the Willamette Woolen Manufacturing Company to take from the flume or penstock which the state should thereafter construct any amount of water, not exceeding such quantity as can be conveyed through a six-inch pipe, being the same right or privilege reserved by the Willamette Woolen Manufacturing Company in its grant to the State of Oregon. Subsequently, the state erected upon the southern portion of the tract purchased

of Savage, and adjacent to Mill Creek, a penitentiary, which, with other buildings necessary to the maintenance of such an institution, has been surrounded by a stockade and inclosure, comprising five acres of land, more or less, and including within its confines one channel of Mill Creek. A race or canal has been excavated by the state, diverting the water from the right bank of Mill Creek a mile above the penitentiary, and conducting the same within the stockade, where it is returned to the channel. On the northern part of this tract, about a third of a mile north of the penitentiary, the state in 1880 erected an asylum for the insane, which has ever since been maintained as such. The state has long been utilizing the water at the penitentiary for propelling machinery for manufacturing purposes, and has operated pumps, at first one, then later two, for supplying certain of the state institutions with water from the creek. When the asylum was erected, a four-inch water main was laid thereto from the penitentiary, water being supplied to the institution thereby. In 1885 or 1886 this main was replaced by one six inches in diameter. From 1880 to 1898 these mains were supplied by one pump, conducting the water from a cistern constructed for the purpose at the penitentiary by a ten-inch suction pipe. At the latter date another cistern was constructed and pump added, each taking the water from the new cistern by a ten-inch pipe, the old cistern being abandoned. By these means water has been supplied to the state penitentiary for irrigation, cooking, manufacturing, sanitation, and such other purposes as were required, to the asylum for like purposes, to the state capitol for hydraulic, standpipe, and other uses, and for a long time to the orphans' home and the state fair grounds. It is also alleged by the complaint that the defendants, comprising the Governor, Secretary of State and State Treasurer, constituting the board of trustees for the state insane asylum, the superintendent of that institution, and the visitor and superintendent of the Oregon State Penitentiary, are wrongfully diverting water from Mill Creek, far in excess of the grant of the Willamette Woolen Manufacturing Company, as evidenced by its

·deed of March 7, 1865, and are thereby invading the rights and privileges of the plaintiff acquired through legislative grant, and the construction and operation of its canal and water way for conducting water from the Santiam River to the City of Salem; wherefore plaintiff seeks to enjoin the diversion of such excess.

Defendants set up four defenses. By the first it is alleged that Savage, in addition to the 147 acres of land, sold and conveyed to the state all the water in Mill Creek, except sufficient for his own stock, and that Mill Creek has at all times furnished and supplied from natural sources alone more water than the defendants and their predecessors in office have used for the penitentiary, asylum, and other state institutions, and that ever since said date the State of Oregon has been, and is now, the owner of said land and all the water in Mill Creek, including the water introduced therein from the Santiam River, save as aforesaid; that after the construction by the state of the penitentiary and asylum buildings, and after the six-inch main was laid from the former to the latter, the supply of water became slack and insufficient, because of the canal ·connecting Mill Creek with the Santiam River and the channel of Mill Creek becoming obstructed and out of repair, whereupon it was agreed between the plaintiff and the defendants' predecessors in office that the State of Oregon would furnish the necessary men, money, and materials to clear out said obstructions from Mill Creek and repair the canal connecting it with the Santiam River, in consideration whereof the state should have the right and privilege of taking from Mill Creek sufficient water to supply the state institutions; that, in pursuance of such agreement, the state put a large force of men and teams at work, and removed such obstructions, straightened, widened, deepened, and diked the channel of Mill Creek, and constructed a wing dam in the Santiam River at the head of the canal, thereby greatly increasing the flow of water in Mill Creek; and that the state, through its officers and agents, has ever since assisted in maintaining said channel in Mill Creek in repair, and has expended a large

amount of labor and money in so repairing and keeping in · repair such water way, whereby plaintiff is now estopped to claim that the state is not entitled to sufficient of the water of Mill Creek to supply the needs of such institutions. By the second defense it is alleged that this is in effect a suit against the state; by the third, that the water now being used to supply such state institutions is taken from a well supplied by means of underground springs and currents in the same manner as wells are ordinarily supplied, but as to whether or not it is wholly so supplied defendants are without knowledge; and, by the fourth, that the state has been in the adverse use of the water, sufficient to supply such institutions, for a period of more than ten years prior to the commencement of this suit.

The Governor of the state is required to visit the penitentiary four times a year, and oftener if necessary, and the Governor, Secretary of State, and State Treasurer constitute the board of trustees of the Oregon State Insane Asylum.

MODIFIED.

For appellants there was a brief over the names of *D. R. N. Blackburn,* Attorney General, and *Carson & Adams,* with an oral argument by *Mr. John A. Carson* and *Mr. Loring K. Adams.*

For respondent there was a brief over the names of *Williams, Wood & Linthicum,* and *Charles A. Park,* with an oral argument by *Mr. George H. Williams* and *Mr. Stewart B. Linthicum.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

1. The question of most vital concern is whether the suit is in effect against the state, although it is not named as a party to the record. The point is conceded that a state is not suable without its consent. The principle is fundamental, and is invoked by the defendants as inimical to the court's taking or assuming jurisdiction to determine the controversy herein or to grant the relief demanded. Mr. Justice MILLER, in *Cunningham* v. *Macon & Bruns. R. Co.* 109 U. S. 446, 451 (3 Sup.

Ct. 292, 296), says: "This principle is conceded in all the cases, and whenever it can be clearly seen that the state is an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction." Latterly, it has become the settled rule that the parties named upon the record will not be deemed as a controlling feature by which to determine whether the suit or action will lie, when the jurisdiction of the court is questioned on account of the relief demanded being in reality against the state. The court will look behind and through the nominal parties to the record, and ascertain if possible who are the real parties to the controversy, and will be governed accordingly; and if it appear that the state, and not the individuals named on the record, is to be affected, it will stay its hand, and in no event, if it appear that the state is an indispensable party, will the relief be granted unless it submits to the jurisdiction: *Ex parte Ayers,* 123 U. S. 443 (8 Sup. Ct. 164)'; *Cunningham* v. *Macon & Bruns. R. Co.* 109 U. S. 446, 451 (3 Sup. Ct. 292, 296); *Poindexter* v. *Greenhow,* 114 U. S. 270 (5 Sup. Ct. 903); *Louisiana* v. *Jumel,* 107 U. S. 711 (2 Sup. Ct. 128); *Hagood* v. *Southern,* 117 U. S. 52 (6 Sup. Ct. 608); *Belknap* v. *Schild,* 161 U. S. 10 (16 Sup. St. 443); *Stanley* v. *Schwalby,* 162 U. S. 255 (16 Sup. Ct. 754); *Pennoyer* v. *McConnaughy,* 140 U. S. 1 (11 Sup. Ct. 699).

There is another view of the matter, as affording a substantial reason for denying the relief, which is that the jurisdiction fails for want of suitable subject matter; that is to say, that the defendants, who are sued as functionaries of the state, have no real but only a nominal interest in the controversy, the state appearing to be the real defendant; hence they cannot be held accountable for what they did not do for themselves. But if it appear from the record that the relief sought is against persons or individuals in their official capacity as representatives of the state, and that it alone is to be or can be affected by the determination of the court, then is the suit directed in reality against the state, and, because it is not suable, the court is without jurisdiction. In the endeavor to lay down a rule by

which it might be determined by a consideration of the record
whether the suit or action is one against individuals, and not
in reality against the state, Mr. Justice MILLER, in *Cunningham
v. Macon & Bruns. R. Co.* 109 U. S. 446, 451 (3 Sup. Ct. 292,
296), observes of a class of cases wherein an individual is sued
in tort for an act injurious to another in regard to person or
property, to which the defense is made that he proceeded under
directions from the government, that "in these cases he is not
sued as, or because he is, the officer of the government, but as
an individual, and the court is not ousted of jurisdiction be-
cause he asserts authority as such officer.   To make out his
defense, he must show that his authority was sufficient in law
to protect him."   This court has adopted the same principle.
In his opinion in *Dunn* v. *State University,* 9 Or. 357, 362, Mr.
Justice WATSON says: "An agent of the state, whether incor-
porated or not, by virtue of his character simply, possesses no
such immunity from being sued.   He must show, in his defense
to an action or suit for interfering with private rights, that he
proceeded within the authority conferred by a valid law, or
his defense must fail."   And in *Poindexter* v. *Greenhow,* 114
U. S. 270 (5 Sup. Ct. 903), Mr. Justice MATTHEWS gives the
reasoning upon which this principle is founded, saying: "The
*ratio decidendi* in this class of cases is very plain.   A defend-
ant sued as a wrongdoer, who seeks to substitute the state in
his place, or to justify by the authority of the state, or to de-
fend on the ground that the state has adopted his act and ex-
onerated him, cannot rest on the bare assertion of his defense.
He is bound to establish it.   The state, as a political corporate
body, can act only through agents, and can command only by
laws.   It is necessary, therefore, for such a defendant, in order
to complete his defense, to produce a law of the state which
constitutes his commission as its agent, and a warrant for his
act."

Belonging to this class of cases is trespass upon realty, giv-
ing rise to the action of trespass or ejectment involving the
title.   The leading case upon this phase of the inquiry is that
of *United States* v. *Lee,* 106 U. S. 196 (1 Sup. Ct. 240).   It was

instituted in the state court of Virginia by Lee against Kaufman and Strong, who were in charge under orders from the Secretary of War, to recover a tract of land purchased by the general government at a tax sale, and long held and used, a part of it as a military station, and the rest as a national cemetery. The case was subsequently removed into the federal court, and from there went to the Supreme Court of the United States. The Attorney General of the United States, without submitting the government to the jurisdiction of the court, suggested that the property in dispute was held, occupied, and possessed by the United States for governmental purposes, through its officers and agents, having actual possession for and in behalf of the government, and without any personal interest in it, and therefore that the court had no jurisdiction of the subject of the controversy. The result of the trial upon the evidence adduced was to show that the plaintiff had a valid title and the United States was without any; but, notwithstanding, it was contended that the court could render no judgment against the defendants. The contention was declared to be unsound, and a judgment was given against the defendants as individuals. Subsequent cases by the same court, however, declare that such a judgment is not binding on the general government, so that in reality the action was not against the government, but against individuals, by whose acts, being tortious, and for which they could show no justification, it was not bound. The principle involved was whether the United States, by a mere suggestion through its Attorney General that the title was in the general government, without submitting to the jurisdiction of the court and permitting it to try and determine such title as between the alleged real parties to the controversy, ousted the court of its jurisdiction to proceed with the parties before it. The answer came in the negative. Mr. Chief Justice MARSHALL, at a much earlier date, in *United States* v. *Peters,* 9 U. S. (5 Cranch) 115, 139, declared: ''It certainly can never be alleged that a mere suggestion of title in a state to property in possession of an individual must arrest the proceedings of the court, and prevent their looking into the sug-

gestion, and examining the validity of the title.'' So Mr. Justice MILLER said in the Lee case: ''That the proposition that, when an individual is sued in regard to property which he holds as officer or agent of the United States, his possession cannot be disturbed when that fact is brought to the attention of the court, has been overruled and denied in every case where it has been necessary to decide it.''

In *Stanley* v. *Schwalby,* on the first appeal to the Supreme Court of the United States (147 U. S. 508, 13 Sup. Ct. 418), the Lee case was alluded to, but the question was not pressed nor involved; but, on the second appeal (162 U. S. 255, 16 Sup. Ct. 754), it came up. The United States District Attorney had attempted to appear and intervene in behalf of the United States without appropriate authority from the Attorney General. The judgment of the court was directed against the United States and its property, and for the costs of the proceeding,— not merely against its officers,— and it was held that the United States could not be thus precluded. The doctrine of the Lee case was unquestioned. A later case is that of *Tindal* v. *Wesley,* 167 U. S. 204 (17 Sup. Ct. 770), wherein Wesley brought an action to recover possession of realty against Tindal, Secretary of the State of South Carolina, and Boyles, acting under his directions with reference to the property in dispute. The defense was interposed that they had no interest in the property, that the title thereof was in the state, and that they were exercising ownership merely as its officers and agents. The jurisdiction of the court, however, was maintained; Mr. Justice HARLAN, in an exhaustive and masterly opinion, wherein he reaffirms the Lee case, and commends its doctrine as sound, saying: ''The settled doctrine of this court wholly precludes the idea that a suit against individuals to recover possession of real property is a suit against the state simply because the defendant holding possession happens to be an officer of the state, and asserts that he is lawfully in possession on its behalf. * * And when such officers or agents assert that they are in rightful possession they must make good that assertion when it is made to appear in a suit against them as individuals that the

legal title and right of possession is in the plaintiff.'' Thus it
may be seen from these authorities that whenever officers of
the state or of the United States are sued as individuals, bring-
ing into question the title to realty, the court will not be dis-
possessed of jurisdiction simply because there is a suggestion
on the record that the state or the United States is the true
owner, but it will look into the record, and proceed to try and
determine the title; and if it appear that the individuals,
although sued as officers, are without title or legal authority
in the premises, and the plaintiffs have a good title, it will do
right as between the parties, and render judgment accordingly.

The foregoing discussion is directed to that phase of the
case involving the contention that the plaintiff cannot main-
tain the suit because it is suggested or answered that the state
is the owner of all the water of Mill Creek, or sufficient of the
water of the Santiam River introduced therein, including the
natural flow of Mill Creek, to supply the state institutions,
and that, therefore, this is in reality a suit against the state to
enjoin a trespass, and thereby to preclude its title or right to
such use.

Another phase is presented by the contention that the suit is
designed to compel the specific performance of a contract on
the part of the state. Mr. Justice Gray, in *Belknap* v. *Schild*,
161 U. S. 10 (16 Sup. Ct. 443), has comprehensively stated the
conditions under which an injunction will not lie when the
state is involved. He says: ''But no injunction can be issued
against officers of a state to restrain or control the use of prop-
erty already in the possession of the state, or money in its
treasury, when the suit is commenced; or to compel the state
to perform its obligations; or where the state has otherwise
such an interest in the object of the suit as to be a necessary
party.'' Preceding the announcement of this rule, he makes
another touching the question as to when an injunction will
lie: ''In a suit to which the state is neither formally nor really
a party, its officers, although acting by its order and for its
benefit, may be restrained by injunction, when the remedy at
law is inadequate, from doing positive acts for which they are

personally and individually liable, taking or injuring the plaintiff's property, contrary to a plain official duty requiring no exercise of discretion, and in violation of the constitution or laws of the United States." If the things which it is sought by the suit to require the defendants to do are things which when done and performed constitute a performance by the state of the contract alleged to be controlling in the premises, the suit would be to all intents and purposes one against the state, though nominally against persons who are its officers, as a performance on the part of the officers would be in pursuance of the public duty enjoined upon them, and hence an act of the state itself through its functionaries: *Hagood* v. *Southern,* 117 U. S. 52 (6 Sup. Ct. 608). The converse of the proposition is equally true, that, where the purpose of the suit is to restrain the doing of all such acts as constitute breaches or infractions of the contract, and thereby indirectly to compel the specific performance of the contract, it is likewise a suit against the state, and the court is without jurisdiction in either case to give relief: *Ex parte Ayres,* 123 U. S. 443 (8 Sup. Ct. 164). "Although," says Mr. Justice BRADLEY in *Hans* v. *Louisiana,* 134 U. S. 1, 20 (10 Sup. Ct. 504, 509), "The obligations of a state rest for their performance upon its honor and good faith, and cannot be made the subject of judicial cognizance unless the state consents to be sued, or comes itself into court, yet, where property or rights are enjoyed under a grant or contract made by a state, they cannot wantonly be invaded. Whilst the state cannot be compelled by suit to perform its contracts, any attempt on its part to violate property or rights acquired under its contracts may be judicially resisted, and any law impairing the obligation of contracts under which such property or rights are held is void, and powerless to affect their enjoyment." An apt case, indicating what the court will do by its injunctive process, is *Belknap* v. *Schild,* 161 U. S. 10 (16 Sup. Ct. 443). It was there sought to enjoin government officers from the infringement of a patent, also from the use of property manufactured through the infringement, and for an accounting for profits derived therefrom, and

it was held that such officers were liable to a suit for the infringement, but that they were not liable for the property or the accumulation of profits, as these were already in the hands of the government, the officers being without possession or control over them.

2. This brings us to an application of the principles thus established to the conditions here involved. The state, it will be noted, has not sought to intervene so as to give the court jurisdiction of its entity,—that is, of its person,—and thus empower the court to determine the relative rights and liabilities as between it and the plaintiff, but stands at arm's length, and, through its officers, suggests that its property and property rights are involved, and therefore that the court ought to stay its hand without according to the plaintiff a trial. The defendants aver that they are the officers of the state (and they are so described in the complaint), and that the acts and doings ascribed to them were done and performed in their official capacity, for and in behalf of the state, and not as individuals, and that they have no personal interest in the property within their charge, or in the use of any of the water of Mill Creek. But this does not exonerate them as individuals from liability to the plaintiff. The record does not show, as it did in the Cunningham case, that the state is an interested and indispensable party, without whose presence no relief can be granted, nor, as in the Jumel and Belknap cases, that the property has passed or is within the exclusive possession of the state, nor can it be ascertained without a trial of the issues whether the officers are holding and acting as public functionaries or as individuals. In the latter capacity they are liable; but, if they can produce and show a warrant of authority from the state for their acts, then will they be exonerated. This is the issue, and it cannot be avoided by a suggestion that the state is the real party, unless it is obvious that it is so.

3. But if the state is absolutely without title, and the plaintiff can show that it has a good title, it is impossible that the state could rightfully or lawfully authorize the defendants to possess, control, or utilize the property involved, and their au-

thority must therefore fail. They could not justify their acts. The state, under the constitution, can no more exercise authority over property not its own, except through some recognized process, such as the right of eminent domain, than an individual. If this was not the rule confiscation would follow, and the state could without the semblance of right deprive its citizens of their property without due process of law, contrary to the fourteenth amendment of the federal constitution. It is insisted that the state has the absolute right to take and use any amount of water from Mill Creek; but this is denied, the plaintiff claiming all the right and title thereto except such as granted to the state by its predecessor. This is the matter to be tried. If it appear that the plaintiff's title is good it must prevail against the defendants as individuals, since the state without title cannot authorize them to interfere with the plaintiff's property. All such acts of interference would then be wrongful, and therefore not justifiable, and the judgment, being against the individuals, could not preclude the state. If, however, the defendants can justify their acts by rightful authority from the state, then no judgment can be pronounced against them, because it would, in effect, be a judgment against the state, and the court would be without jurisdiction in the premises.

4. Again, it is suggested that to restrain the defendants from taking more water than the state is entitled to under the grant from the Woolen Mills Company, or to require all water taken in excess of the grant to be returned to the stream, would in effect be to compel the specific performance on the part of the state of the contract by which it obtained the primary right. Why this should be so we fail to understand. If A obtains from B a deed to one acre of land, and B enters into the possession of two, and is sued to recover possession of the acre to which he is not entitled, it could not be said that A is seeking to require B to specifically perform his contract, and yet this is the exact result to which the contention leads. There is no breach of contract or omission to perform on the part of B by entering into the possession of the two acres, but he

becomes a trespasser as to that to which he has no title. So with the grant of the amount of water that can be pumped through a two-inch pipe to the state. It is not an omission to perform when the officers of the state take more water than the grant entitles them to, and because they are restrained from taking the excess there is no requirement resembling a specific performance of the contract. Because the state has a grant for two inches of water, it affords no right or authority to take four inches, or twenty or a hundred, and, when it exceeds the amount given by the grant, it becomes a trespasser to that extent, and invades the rights of the plaintiff. So that there is here no attempt to require the specific performance of any contract, and the contention fails. The case here is therefore not one in which the judgment will operate against the defendants as officers of the state, nor in which it is sought to compel the specific performance by the state of any contract alleged to have been made by it.

5. We come now to a consideration of the case made by the evidence adduced. The plaintiff shows a clear right to all the water of Mill Creek introduced therein from the Santiam River, except such as its predecessor has granted to the state. Beyond this we are not prepared to go. It has riparian rights as respects the natural flow of Mill Creek, but it has not proven to our satisfaction that it has appropriated the water thereof, or otherwise acquired any interest therein, except such as it may rightfully enjoy by reason of its riparian privileges. There was introduced in evidence an agreement between the president and directors of the Willamette Woolen Manufacturing Company and M. L. Savage, of date April 10, 1857, whereby it is stipulated that Savage is to have the free use upon his own premises where Mill Creek flows through the same of a water power from any privilege which the company may create by virtue of bringing water into Mill Creek from the Santiam River. It is now asserted that the state has succeeded to this right through its deed from Savage; but, if this be conceded, it is of no significance, as the Willamette Woolen Manufacturing Company, by its grant to the state, invested it

42 OR.—7

with a privilege of the same nature, fully as extensive as any
that could be claimed under that particular agreement. So
far, therefore, as the natural flow of the water in Mill Creek is
involved, this becomes a controversy between riparian proprie-
tors. As to the water introduced into Mill Creek from the
Santiam, the state has such right as it originally obtained by
the grant from the Woolen Mills Company, and such, if any,
as it acquired later in addition thereto by prescription as
inuring to it by adverse user. Riparian rights do not extend
so far as to authorize the state to supply with water from the
stream a sufficient amount to accommodate and meet the neces-
sities of irrigation, cooking, laundry, sanitation, etc., for such
institutions as the state penitentiary and the asylum for the
insane, where from 1,300 to 1,500 persons are kept in constant
confinement, the latter institution being located from a quar-
ter to a third of a mile distant from the course of the stream.
It is analogous to many cases to be found in the books, where
individuals have claimed the right by reason of their riparian
ownership to supply towns and cities with water, or where
towns and cities adjacent to some part of a stream have
claimed a sufficient quantity to supply the remote parts or
portions thereof, but without avail: *City of Emporia* v. *Soden,*
25 Kan. 588 (37 Am. Rep. 265) ; *Stein* v. *Burden,* 24 Ala. 130
(60 Am. Dec. 453) ; *Harding* v. *Stamford Water Co.* 41 Conn.
81; *Company of Proprietors of Medway* v. *Romney,* 9 C. B.
(N. S.) 575; *Lord* v. *Meadville Water Co.* 135 Pa. St. 122
(19 Atl. 1007, 8 L. R. A. 202, 20 Am. St. Rep. 864). The state-
ment of the legal principle involved by the facts and condi-
tions enumerated is, however, sufficient of itself to indicate its
soundness, and we do not understand that it is seriously con-
troverted.

6. The matter of estoppel against the plaintiff, set up by the
first separate answer, does not appear to be insisted upon by
the defendants otherwise than as it serves to strengthen and
establish the state's alleged prescriptive right to the use of
water beyond the amount comprised by the grant. We will
therefore pass to a consideration of what prescriptive right,

if any, beyond the amount fixed by the grant, the state has acquired in and to the use of the water of Mill Creek, including the water introduced therein from the Santiam. In the year 1890 a freshet washed away the wing dam at the Santiam, constructed for diverting the water into the canal and thence to Mill Creek, and impaired more or less such canal and the channel of the creek by the deposit of sediment and debris at numerous places, and carried away embankments at others, so that it materially interrupted the supply of water at the penitentiary and for the operation of mills and machinery within the city. For the purpose of repairing these damages and reinstating the water supply, there was expended in material, labor, and money, under the supervision of the plaintiff's manager and agents, about $2,500. The evidence tends strongly to show that, by some understanding between the plaintiff and the authorities at the penitentiary and asylum, such authorities agreed to furnish, and did furnish, in labor about the equivalent of one fourth of that sum. Inmates of both the asylum and penitentiary were sent out with teams, and performed a very considerable amount of work, contributing in no small degree to the needed repairs. It should be noted in this connection that not only the plaintiff, but the Thomas Kay Woolen Mills Company, the Salem Water Company, the mill at Aumsville, and one at Stayton, and individuals along the way interested in having the channel restored to its original condition and the water supply maintained therein, contributed to the attendant expenses. There is some testimony indicating that an increased quantity of water was obtained from the Santiam River, and through the sources of Mill Creek by the work thus expended, but it is not sufficient to establish the condition, nor does it appear from a very careful review of the testimony upon the subject that there was any agreement that in consideration of the labor to be contributed by the penitentiary and asylum authorities the state should have or be entitled to any increased or other rights and privileges beyond such as it previously enjoyed. The resultant condition seems to have been that the freshet diverted and

impeded the necessary and usual water supply through Mill Creek to the state institutions and the mills and factories in Salem. The emergency having been found to exist, the contributions by interested parties, the penitentiary and asylum authorities included, to the fund were resorted to as an expedient to remedy the evil, not with any intention of creating any new conditions or obligations, correlative or otherwise, but merely that all might enjoy the privileges formerly obtaining. In 1895 an appropriation was made by the legislative assembly of the state of $7,500 for clearing out Mill Creek and constructing a levee upon both banks thereof from the state penitentiary to and across the reform school lands. This money was expended through the proper officers for the purposes appropriated; but there was no semblance of any contract or relation arising between the state and the plaintiff by reason thereof, nor does it appear that the plaintiff was in any way instrumental in having the appropriation made or the work done, or has done any act or thing in connection therewith whereby to estop it in any manner to claim its rights and privileges theretofore existing as against the state. This comprises principally all the contributions the state has made toward the maintenance of the water way.

7. It is established by the witnesses Scott and Culver, who made a thorough examination of the water way from Salem to the Santiam River in 1896, that at the time the state institutions were being supplied with water at the penitentiary from Mill Creek by a Dow duplex pump, taking from an eight-foot cistern, which was supplied directly from the tailrace, and that the pump was discharging more water than could be supplied through a two-inch pipe, and, by Eastwick's testimony, that the pumps at the new cistern were, just prior to the trial herein, discharging water in excess of the capacity of such a conduit. Other witnesses, who made a special examination in 1899, ascertained the fact to be that the new cistern received its supply from the tailrace; that is, from Mill Creek. The fact that both the old and the new cistern received their supply in a large measure from Mill Creek, through the instrumental-

ity of the tailrace in each instance, is scarcely controvertible, nor is there any serious contention to the contrary.

Now, as to the alleged prescriptive right. The four-inch pipe or main was first laid to the asylum about 1880, and this was replaced by a six-inch main in 1885. Mr. Strang perhaps voices the consensus of the testimony on this phase of the case, and we will therefore make more particular mention of what he has to say. He was engineer at the asylum from 1883 to July, 1885, and from January, 1894, to the present time. The old pump was used until 1898, when the new station was erected and established, from which time two pumps were used, each with a ten-inch suction pipe, the old having been supplied with a pipe of like dimensions. Referring to this pipe, he was asked how many gallons it would throw, to which he answered, "It would depend upon the speed of the pump." He then continues, in substance, that the last time he counted the revolutions it would throw in the neighborhood of 290,000 or 300,000 gallons every twenty-four hours, the estimate having been made after the new system was put in operation; that the work of laying the pipe in 1885 was done openly, an appropriation having been made for the especial purpose, and that no effort has ever been made by the asylum authorities to conceal any fact tending to reveal the quantity of water used; that the water when once drawn into the main does not return in any considerable quantity to Mill Creek, and that some years ago a well was sunk at the asylum, which supplies that institution with cooking and drinking water. This is followed by a description somewhat in detail as to when and in what manner the water was used. Mr. Eastwick estimates that about 216,000 gallons could be delivered through the two-inch pipe every twenty-four hours, so that Mr. Strang shows an actual delivery in excess of this. Dr. Williamson testifies that more water is now being used at the asylum than when he became connected with that institution, in 1886. There is nothing more definite than this as to the quantity of water taken for use at these state institutions during the ten years preceding the commencement of this suit. It exceeded the capacity

of the two-inch supply pipe, no doubt, in later years, but it is certainly not deducible from the testimony that there was an excess as early as 1880 or 1885 or 1890 or 1892. The main was of sufficient capacity to carry a much larger amount than could be drawn through the two-inch pipe, but the pumps governed the quantity forced into the main, and that was in turn regulated by the speed at which the pumps were operated. The diversity of use to which the water was applied furnishes no reliable standard, either as to the quantity or as to what date in the past any given amount was taken. Another condition is that the means by which the water was taken into the cisterns from the tailraces were concealed absolutely from all ordinary observation. Before the plaintiff could be informed that any was being drawn in from Mill Creek above the amount to which the state was rightfully entitled, it had to obtain the consent of the authorities in charge at the penitentiary (which it should be stated was freely given) to enter the cisterns and make a special examination. It was with difficulty even then that the discovery was made, but, as soon as made, the plaintiff began to protest against the taking of so much water, which it continued until the institution of this suit.

8. The prescription claimed is wanting in two ingredients essential to its validity: the taking and use was not open and notorious, such as to bring notice home to plaintiff that more water was being used than the state had a right to by its grant; and the quantity and time of use has not been so definitely established that the court can say with reasonable certainty that any amount of water in excess of the grant has been used by the state in connection with its various institutions for a period of more than ten years prior to the commencement of the suit. The user, to be adverse, must be attended by such circumstances of notoriety as would reasonably impart notice to the person to be affected, as there can otherwise be no presumption of his acquiescence, which is essential to the prescription. It "must not be clandestine or by stealth, but open, notorious, visible, and indisputable," so that the party affected may be enabled to resist the prescriptive acquisition

by suit in time, before the statutory period has elapsed: Gould, Waters (3 ed.), § 337; 19 Am. & Eng. Enc. Law (1 ed.), 23. It is axiomatic that the right acquired by prescription is exactly commensurate with the right enjoyed; that is, the extent of the enjoyment measures the extent of the right. Furthermore, the right gained is always confined to the right as exercised during the full period required by the statute of limitations: *Boynton* v. *Longley*, 19 Nev. 69 (6 Pac. 437, 3 Am. St. Rep. 781). This being so, it is essential that he who seeks to establish such a right must show definitely what right he has enjoyed, the extent of it, and that it has been continuous in that relation for the statutory period. Uncertainty and indefiniteness in these particulars, so that it cannot be determined as to the extent of the user and the time of definite use, are inimical to a substantiation of the right.

From these considerations plaintiff is entitled to a decree against the defendants, restraining them from diverting from Mill Creek, for use at the state institutions or otherwise, any water in excess of such an amount as can be pumped through a pipe not exceeding two inches in diameter. The water power to be utilized for propelling machinery and for mechanical purposes is not questioned. Whatever pumps and appliances have been put into place, including water pipes and mains for the purpose of diverting water and applying it to use, have become the property and are now in the possession of the state, so that the decree cannot extend to or affect them in any particular, and the finding as to the plaintiff's title to the natural flow of the water in Mill Creek will be omitted. So far as the decree of the trial court is not in harmony with these directions it will be modified; otherwise it will be affirmed.

MODIFIED.

Decided 8 December, 1902.

ON MOTION TO RECALL MANDATE.

PER CURIAM. This is a motion to recall the mandate for the purpose of having eliminated from the decree the following provision: "Appellants, and each and all of them, and the

agents, employes, and attorneys of them, and each of them, and each and all of the successors of appellants, and their, and each of their, agents, employes, and attorneys, in taking from said Mill Creek such an amount of water as they can pump through a pipe not exceeding two inches in diameter, are hereby enjoined from using any appliances for such purpose which will take or permit the taking of any greater quantity of water than can be pumped through a pipe not exceeding two inches in diameter.'' The argument is that, under the Savage deed, for purposes other than mechanical, the state is entitled to take such a quantity of water as it can pump through a pipe not exceeding two inches in diameter, and that the size of the pipe is specified in the deed as a measure of the quantity of water to be taken, and not the means by which it shall be taken, so that it is immaterial what the capacity of the appliances is, if no more water is actually taken than the quantity specified. But it is not necessary for us to stop to consider whether this is a correct interpretation of the deed. The record shows that in 1897 the then agents of the state, regardless of plaintiff's rights, constructed within the penitentiary stockade a large, covered cistern, to which they connected pumping works having a capacity several times in excess of the amount of water that can be pumped through a two-inch pipe. By means of a secret and underground conduit, they tapped Mill Creek where it passes through the stockade, and thereby conveyed enough water to the cistern so that thereafter, notwithstanding it was constantly being pumped therefrom through two ten-inch suction pipes, it was still maintained at the same level as the water in the creek. These pumps and works are the property of the state, are within its inclosure, and under the sole charge of its agents and servants. They are not open to the inspection of the plaintiff, or of any one else, except by special permission of the parties in charge thereof. It is clear, therefore, that the plaintiff can have no possible means of ascertaining and determining from time to time whether its rights are being invaded, if the state is permitted to maintain suction pipes and other appliances for the purpose

of supplying the pumps with water that will take or permit to be taken large quantities of water in excess of that to which the state is entitled. The only efficient remedy for the plaintiff is an injunction restraining the use of any appliances for the purposes stated that will take or permit to be taken more water than can be pumped through a two-inch pipe. The decree is not intended to affect the right to use the pumps and appliances now in place in any other respect. The motion will therefore be denied. MOTION DENIED.