Argued February 1, decided February 20, rehearing denied April 9, 1912.

## CORVALLIS & EASTERN R. CO. *v.* BENSON*

[121 Pac. 418.]

EVIDENCE—JUDICIAL NOTICE—LAWS OF THE STATE.

1. The Supreme Court takes judicial notice of all the acts of the legislative assembly of the State.

PLEADING—DEMURRER—MATTERS RAISED BY DEMURRER.

2. The court taking judicial notice of all acts of the legislative assembly of the State, questions as to the validity of statutes granting public

* This case has been appealed and is now pending in the United States Supreme Court.  REPORTER.

lands in aid of a railroad, alleged in the complaint, under which plaintiff claims, are properly raised by general demurrer to the complaint, without the necessity of proving them or making findings of fact with respect thereto.

STATUTES—TITLE OF ACT—CONSTITUTIONAL RESTRICTIONS IN GENERAL.

3. Under Article IV, Section 20 of the constitution requiring that every act shall embrace but one subject and matters properly connected therewith, which subjects shall be expressed in the title, it is enough if the title is a fair index of the general purposes of the proposed law, the details not necessarily being a part of the title, but properly worked out in the body of the act; and as every intendment is in favor of the constitutionality of a statute, if by any fair inference the terms of a statute may be found to be cognate to the terms of its title, the statute will stand.

STATUTES—TITLE OF ACT—GRANT OF LAND TO RAILROAD—"PROVIDE."

4. Article IV, Section 20 of the constitution provides that every act shall embrace but one subject and matters properly connected therewith, which subjects shall be expressed in the title, and the act approved October 24, 1874 (Laws 1874, p. 51), entitled "An act to provide for the construction of the Willamette Valley & Coast Railroad," granted to that railroad all the tide and marsh lands situated in the county of Benton, and the right to take from lands adjacent to its line material for the construction of the road, and that upon the filing of its acceptance thereof within 30 days the company should become invested with absolute title thereto, to be thereafter set apart. *Held,* that the word "provide" means to obtain or make ready supplies or means for future use, to take measures in view of an expected or possible need, and that within the meaning of that term the grant of land was germane to the title of the act.

NAVIGABLE WATERS—TIDELANDS—OWNERSHIP BY STATE—"JUS PRIVATUM"—"JUS PUBLICUM."

5. Under the common law and Act Cong. Feb. 14, 1859, c. 33, 11 Stat. 383, admitting Oregon as a State, and providing that all the navigable waters of the State should be common highways forever free to the inhabitants of the State and to all other citizens of the United States, the tidelands between high and low-water mark became the property of the State; and in the title thus acquired there were two elements—the *"jus privatum,"* or private right, and the *"jus publicum,"* or public right; the *jus privatum* being a species of private property which the State held the same as a private owner, and might grant to any one, in any manner, or for any purpose not forbidden by the constitution, the grantee thereby taking the title as absolutely as under a private conveyance; but the *jus publicum,* being the domininion of sovereignty in the State, by which it prevents any use of lands bordering on navigable waters which would materially interfere with navigation and commerce thereon, cannot be abdicated or granted.

STATUTES—AMENDMENT AND REVISION—CONSTITUTIONAL RESTRICTIONS.

6. Act Feb. 5, 1885 (Laws 1885, p. 5), entitled "An act to re-enact and amend an act, approved October 24, 1874, entitled 'An act to provide

for the construction of the Willamette Valley & Coast Railroad,' as amended by the act approved October 14, 1878, entitled 'An act to amend an act entitled "An act to provide for the construction of the Willamette Valley & Coast Railroad," approved October 24, 1874,' and to confirm the rights of the said railroad company under the said acts," and which declared by Section 1, after referring to the former act, that it was thereby re-enacted with the amendments thereinafter specified, and by Section 2 that Section 5 of the act of 1874, as amended by the act of 1878 (Laws 1878, p. 4, § 4), be amended "so as to read as follows," etc., and by Section 3 that the State thereby expressly waived all rights reserved under the former acts, and that nothing in them should be construed to work a forfeiture, in so far as it purported merely to amend the former act by mere reference to its title, violated Article IV, Section 22 of the constitution providing that no act shall be so revised or amended, but that the act revised or the section amended shall be set forth at full length; but as to Sections 2 and 3 was not in conflict with that provision.

PUBLIC LANDS—GRANT TO RAILROAD—WAIVER OF FORFEITURE.
7. Where public land is granted to a railroad corporation, subject to forfeiture to the State if a certain line of its railroad is not completed by fixed time, it is competent for the legislature thereafter to waive a forfeiture and confirm the title of the corporation to the land, although it might not have complied with the terms of the grant.

PUBLIC LANDS—GRANTS—"FLOAT."
8. "Float" is a term applied to a grant of land by the government, land not having been specifically selected; that is, a general grant of a certain amount of lands to be selected in the future by the grantee.

NAVIGABLE WATERS—TIDELANDS—CONSTRUCTION OF GRANT—SURVEY.
9. Under act approved October 24, 1874 (Laws 1874, p. 51), which granted to a railroad company certain tidelands, and the right to take from adjacent lands material necessary for the construction of its road, and which provided that when it was reported that 10 miles of road had been equipped the Governor of the State should cause the land to be surveyed and set apart for the benefit of the company, the condition that the Governor should cause the land to be surveyed was a mere gratuity or part of the grant, and did not affect the title passed by the act, in the absence of plain words postponing the effect of the grant to the time when the survey should be completed and the State had parted with and the railroad acquired all the private right of the State in such lands.

EMINENT DOMAIN—TAKING PROPERTY—REPEALING PUBLIC GRANT.
10. Act Feb. 23, 1909 (Laws 1909, p. 221), repealing Section 1 of the act approved October 24, 1874 (Laws 1874, p. 51), granting certain tidewater lands to a railroad company, and act approved February 5, 1885 (Laws 1885, p. 6) Section 3, waiving the forfeiture of the rights reserved by the State under former acts, violates Article I, Section 18 of the constitution declaring that private property shall not be taken for public uses without just compensation, nor, except in case of the State, without such compensation first assessed and tendered.

INJUNCTION—OFFICERS—STATE BOARD.

11. Officers constituting the State Land Board, as a board of commissioners for the sale of school and university lands, may be enjoined from an intended unlawful sale of tidelands already granted by the State.

From Marion: WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE BURNETT.

This is a suit for an injunction by the Corvallis & Eastern Railroad Company against Frank W. Benson, as Governor, Frank W. Benson, as Secretary of State, and George A. Steel, State Treasurer of the State of Oregon, constituting the State Land Board as a Board of Commissioners for the sale of School and University Lands and for the investment of the funds arising therefrom. The facts are as follows.

The legislative assembly of 1874 passed an act, approved October 24th of that year, entitled "An act to provide for the construction of the Willamette Valley & Coast Railroad." The first section of that act reads as follows:

"That there be and is hereby granted to the Willamette Valley & Coast Railroad Company, or its assigns, all the tide and marsh lands situated in said county of Benton, and also the right to take from the lands adjacent to the line of said road, timber, stone, water, and other material necessary to the construction of said road, provided that the said company shall within thirty days after the passage of this act file with the Secretary of State their acceptance of said grant and of all the terms of each and every part of this act and of all the conditions herein contained to be performed by such company, and that upon the filing of said acceptance, as aforesaid, the company shall have become invested with and in absolute title to said land aforesaid as afterward to be set apart and designated, and shall in consideration thereof be bound by all the provisions of this act hereinafter contained and set out."

By an elaborate scheme, set out in subsequent sections of the act, the company was authorized to mort-

gage each 10 miles of its road as completed and reported upon by commissioners appointed by the Governor, which mortgage should be a lien in favor of the bondholders upon all the property of the company, including the lands granted by the act, and should run to the Secretary of State as trustee for the bondholders. In the second section, it was laid down that when the commissioners, provided for in the act, reported that 10 miles of road had been equipped and established "then the Governor of the State shall cause the land herein granted to be surveyed, designated and set apart for the benefit of said company." Laws 1874, p. 52.

By an amendatory act, approved October 14, 1878, Laws 1878, p. 1, the feature of mortgaging the property to the Secretary of State for the benefit of the bondholders was eliminated. The time for the completion of the road from Yaquina Bay to Corvallis was extended for six years from the date of the approval of the act, with the further condition that, if said company should fail to complete and equip the road from Corvallis to tidewater on Yaquina Bay "within said six years, then and in that case said act shall become void and the property and rights granted to said company shall become forfeited to the State." The amendatory act provided that on acceptance of the grant, in the terms of the act, within 30 days after approval "the said company shall have and become invested with the title to said land thereby granted to be set apart and designated as in this act provided, and shall, in consideration thereof, be bound by all the provisions of this act." The legislative assembly of 1885, by an act approved February 5th of that year (Laws 1885, p. 5), passed an act entitled:

"An act to re-enact and amend an act, approved October 24, 1874, entitled 'An act to provide for the construction of the Willamette Valley & Coast Railroad,'

as amended by the act aproved October 14, 1878, entitled 'An act to amend an act entitled "An act to provide for the construction of the Willamette Valley & Coast Railroad," approved October 24, 1874,' and to confirm the right of said railroad company under the said acts."

The first section of the latter act states, in substance, that the act of October 24, 1874, as amended by the act of October 14, 1878, should be and was thereby re-enacted with the amendments specified in the act. Section 2 of the act of 1885 reads thus:

"That Section 5 of said act, approved October 24, 1874, as amended by the said act approved October 14, 1878, be, and the same is hereby amended so as to read as follows: 'Section 5. That the time for the completion of the said Willamette Valley & Coast Railroad, by said railroad company, from tide water on Yaquina Bay to the city of Corvallis in Benton County, Oregon, be and the same is hereby enlarged and extended for seven years from October 14, 1878.'"

Section 3 of the act of 1885 reads thus:

"That the title of said railroad company to lands mentioned in said act be, and the same is ratified and confirmed, and this State hereby expressly waives all rights reserved under said act and nothing therein contained and no failure to comply with any of the provisions thereof shall be construed to have worked a forfeiture of any of the grants, rights, privileges or immunities granted, or intended to be granted, in either of said acts subject to the following provisions."

The provisos alluded to exclude land within the boundaries of the grant which had been patented by the State or the United States to other parties prior to January 1, 1885, and also eliminate certain particularly described tracts of land on Yaquina Bay. By an act filed in the office of the Secretary of State February 23, 1909 (Laws 1909, p. 221), the legislative assembly of that year repealed the granting section 1 of the original act,

approved October 24, 1874, and section 3 of the act approved February 5, 1885, waiving the forfeiture of the rights reserved under the acts to which allusion has already been made.

In its complaint, the plaintiff alleges its corporate existence, the official character of the defendants, and their duties as the public land board, and avers that it is the successor by mesne conveyances to the title of the Willamette Valley & Coast Railroad Company in the tidelands mentioned in the act of 1874. It narrates the history of the legislation already alluded to, in detail, and its acceptance of the grant made by the terms of the several acts of the legislature, stating that the company accepted the grant of 1874 on the 11th day of November of that year, and that the grant of 1878 was accepted on November 7th of that year. The latter acceptance is admitted by the defendants and they also concede that on February 3, 1884, the Governor of the State appointed a commission to examine the 10 miles of road constructed at that time, and that on the 9th of the same month the commissioners reported that they had examined it and found it completed in all respects as provided by the act. The complaint further avers that the defendants claim the State of Oregon is the owner of a tract of 1.45 acres, set out by metes and bounds, and that they are intending to sell the same in the name of the State of Oregon, and will do so, unless restrained by an order of the court; that these lands are included within the tidelands described in the act already mentioned; and that if the defendants should sell the same it would put a cloud on plaintiff's title, to its irreparable injury.

A general demurrer to the complaint was overruled by the circuit court, whereupon the defendants answered. After certain admissions, the second paragraph of the answer reads thus:

"Deny all the material allegations of paragraphs 3, 4, 5, 6, 7, 8, 12, 13, 14, 15, 16, 17, 18 of the complaint, except as hereinafter expressly admitted or qualified."

The answer affirmatively recites that the tract of 1.45 acres is situate on the shore of Alsea Bay, an arm of the sea, and lies between ordinary high tide and ordinary low tide; that it belongs to the State of Oregon by virtue of her sovereignty; that the State is the owner thereof, holding the same in trust for its people for purposes of navigation, fisheries, and commerce; and that the State has no authority to sell or convey the lands, or any portion thereof, or any right or interest therein, except for the purpose for which it holds said lands in trust, as aforesaid. The history of the legislation alluded to in the complaint is substantially repeated by the answer. The defendants allege that the lands are unsurveyed; that they lie without the meander line of the United States surveys along the shore of the bay; that they have never been surveyed, designated, or in any manner set apart by the Governor of the State, or by any other authority, for the use or benefit of the company; that no portion of the lands described in the complaint is used or occupied by the plaintiff company for any purpose whatsoever; that the same is not within their right of way; and that it is at least 10 miles south of the western terminus of the plaintiff's railroad. The answer concludes with this allegation:

"That prior to the commencement of this suit one C. R. Evans applied to purchase said tract of tideland mentioned and described in paragraph 5 of plaintiff's complaint herein, for the purpose of diking the same and building thereon docks, warehouses, etc., in aid of commerce and navigation of said water of said Alsea Bay; that it is necessary to pass over these tidelands, in order to reach the deep water of Alsea Bay, and to build and construct on the same wharves or other structures at

which boats may land, and load and unload passengers
and freight, and defendants are about to sell said small
tract, which is only a small portion of the tidelands of
said Alsea Bay, and the shore thereof, for the purpose
of securing the construction thereon of said improve-
ments for the purpose to aid the navigation of said bay
and the commerce of the country adjoining said bay,
and for no other purpose whatever."

A general demurrer to the answer of the defendants was
overruled by the circuit court, and afterwards the plain-
tiff replied denying generally and specifically each and
every allegation set out in the defendants' further and
separate answer and defense.   At the trial the circuit
court made findings of fact and conclusions of law, and,
based thereon, entered a decree dismissing the suit and
dissolving the temporary injunction, from which the
plaintiff appeals.        REVERSED : DECREE RENDERED.

For appellant there was a brief over the names of
*Messrs. Weatherford & Weatherford,* with an oral argu-
ment by *Mr. James K. Weatherford.*

For respondents there was a brief over the names of
*Mr. Andrew M. Crawford,* Attorney General, *Mr. Isaac
H. Van Winkle,* Assistant Attorney General, and *Mr.
Roy F. Shields,* 2nd Assistant Attorney General, with
an oral argument by *Mr. Crawford.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1, 2. One question raised in this proceeding is whether
the title of the act of 1874, it being, "An act to provide
for the construction of the Willamette Valley & Coast
Railroad," is sufficient to authorize the grant of lands
in aid of the construction of the railroad  mentioned.
Another question is whether or not the State has power
in any event to make a grant of land like the one in
question; the contention for the defendants being that to
do so is in derogation of the sovereignty of the State

and beyond the power of the legislature to enact as the law of the land. These questions were properly raised by the demurrer to the complaint; for the court takes judicial notice of all the acts of the legislative assembly of the State, and it is unnecessary to prove them, or to make findings of fact with respect thereto. The affirmative answer of the defendants is nothing more than a restatement of its demurrer, coupled with an argument in its support. Moreover, the plaintiff might well have stood upon its demurrer to the further and separate answer. Neither in the briefs nor at the arguments was any question of fact presented to the court, and the only contention is based upon the matters of law already alluded to. As presented by the counsel for the respective parties, the court will consider the question solely as to the matters of law presented by the pleadings.

3, 4. It is urged on the part of the defendants that to say in the title of the act of 1874 that it is "to provide for the construction of the Willamette Valley & Coast Railroad" does not indicate that a grant of any State lands was to be made to the company, and that such a grant, not being germane to the title, cannot stand. "Provide" means "to obtain or make ready supplies or means for future use." Standard Dictionary. Also: "To look out for in advance; to procure beforehand; to prepare; to supply, afford, contribute; to furnish, procure things in advance; to take measures in view of an expected or possible need." Webster's New International Dictionary. Further: "To procure or furnish supplies, means of defense, or the like, as to provide liberally for the table; to make ready, prepare." Century Dictionary. The act of 1874 by its terms granted the tidelands in the then county of Benton to the Willamette Valley & Coast Railroad Company, and authorized it to mortgage them, under certain conditions, for the purpose of raising funds for the construction of the road.

Within the meaning of the definitions of the term "provide," as noted above, this was clearly germane to the title of the act. It was plainly notice to any legislator voting upon the bill that the State intended in some way to aid the construction of the road. It is not necessary that the title to an act should be as full and complete in its terms as the act itself. It is enough if the title is a fair index of the general purposes of the proposed law. The details may properly be worked out in the body of the act. They are not necessarily a part of the title. Every intendment is in favor of the constitutionality of an act of the legislative assembly; and if, by any fair inference, the terms of the statute may be found to be cognate to the terms of the title the law will stand, and will not be declared unconstitutional. Provision for the construction of the Willamette Valley & Coast Railroad is the only subject mentioned in the title of the act in question. We conclude that within the meaning of Section 20, Article IV, Constitution of Oregon, the grant of land and other matters set forth in the act itself are properly connected with its subject, and that, as against objections to the title, the statute in question is valid. *State* v. *Shaw,* 22 Or. 287 (29 Pac. 1028) ; *State* v. *Koshland,* 25 Or. 178 (35 Pac. 32) ; *Lynch* v. *Murphy,* 119 Mo. 163 (24 S. W. 774) ; *People ex rel.* v. *Kirk,* 162 Ill. 138 (45 N. E. 830: 53 Am. St. Rep. 277). Many other decisions of our own Supreme Court and of other state and federal courts might be cited, but these are sufficient for illustration.

5. It is well settled that the tidelands laid bare, and anon flooded by the sea as it ebbs and flows, became the property of the State on its admission into the Union. In the title thus conferred upon the State, there are two elements—the *jus privatum,* or private right, and the *jus publicum,* or public authority. The former is a species of private property which a state holds in the

same way that an individual citizen owns land which he has acquired from the United States by any of the methods provided for the sale of the public domain, or from any private person by purchase and conveyance. This private property in tidelands, the State by its legislative assembly, may grant to any one in any manner, or for any purpose, not forbidden by the constitution, and the grantee will thereby take the title described in the grant as absolutely as if the transaction were between individuals; one conveying his private lands to the other. The State, however, cannot abdicate or grant away the other element of its title to tidelands —the *jus publicum*, or public authority over them. This is the dominion of government or sovereignty in the State, by which it prevents any use of lands bordering on the navigable waters within the State which will materially interfere with navigation and commerce thereon. For, by the tenets of the common law, as well as by the terms of the act of Congress of February 14, 1859, c. 33, 11 Stat. 383, admitting Oregon as a state into the Union, the rivers and waters forming a boundary between it and other states "and all the navigable waters of said State shall be common highways and forever free as well to the inhabitants of said State as to all other citizens of the United States."

The controlling precedent in this State—the landmark to which all subsequent decisions of this court on this subject are referable—is the masterly opinion of Justice LORD, in *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154), the doctrine of which was affirmed in the Supreme Court of the United States, on writ of error, by a unanimous opinion, after thorough examination and discussion of the whole subject. *Shively* v. *Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548: 38 L. Ed. 331). Summing up the results of his exhaustive research in the case, Justice LORD says: "When the State of Oregon was admitted in to the Union,

the tidelands became its property, and subject to its
jurisdiction and disposal; that, in the absence of legis-
lation or usage, the common-law rule would govern the
rights of the upland proprietor, and by that law the title
to them is in the State; that the State has the right to
dispose of them in such manner as she might deem
proper, as is frequently done in various ways, and
whereby sometimes large areas are reclaimed and occu-
pied by cities, and are put to public and private uses;
state control and ownership therein being supreme, sub-
ject only to the paramount right of navigation and com-
merce. The whole question is for the State to deter-
mine for itself. It can say to what extent it will pre-
serve its rights of ownership in them or confer them
on others. Our State has done that by the legislation
already referred to, and our courts have declared its
absolute property in and dominion over the tidelands
and its right to dispose of its title in such manner as it
might deem best, unaffected by any 'legal obligation to
recognize the rights of either the riparian owners or
those who had occupied such tidelands,' other than it
chose to resign to them, subject only to the paramount
right of navigation and the uses of commerce." The
principles announced in that case have never been dis-
turbed by any decision of this court, and they are yet
to be challenged by any ruling of the federal courts.
They are part of the jurisprudence of the State, and
have become a settled rule of property. They consti-
tute the foundation of many holdings, both great and
small, and to overturn them now, if, indeed, they ever
could have been disturbed, would be to invoke confusion
where certainty ought to be thoroughly established.

The defendant contends that the State holds the legal
title to and dominion over tidelands by virtue of its
sovereignty, and in trust for all the people for the
purpose of navigation, fisheries, and commerce, and that

the title that the State holds to its tidelands is incident to and a part of its sovereignty which cannot be surrendered or alienated, except for some public purpose, or any reasonable use for the public benefit. The fallacy of these contentions at this juncture is that they make no distinction between the *jus privatum* and the *jus publicum,* both of which are elements in the State's complete title. It is the *jus publicum,* or governmental prerogative alone, which the State holds in trust and cannot repudiate or lay aside. On the other hand, like any other owner, it may transfer its tidelands, so far as the *jus privatum* is concerned, always with the condition implied by law that the grant is subject to the paramount rights of navigation and commerce over the waters.

The principal case relied upon by defendants is that of the *Illinois R. Co.,* v. *Illinois,* 146 U. S. 387 (13 Sup. Ct. 110: 36 L. Ed. 1018). The state of Illinois had granted to the railroad company a right of way 200 feet wide from Cairo to Chicago, over the lands and waters of the state, and by consent of the latter city, so far as its interests were concerned, the right of way was located along the margin of Lake Michigan, and an embankment was raised and so protected from the violence of storms on the lake as to make the way safe as a roadbed. From water front lots, adjacent to this levee and owned by it, the company built docks extending out to the deep water of the lake. Afterwards the Illinois legislature passed a law granting to the company the bed of the lake along a mile and a half of the city water front, and extending with that width a mile out into and including most of the outer harbor. This law was repealed by subsequent legislation. The Supreme Court of the United States held that the repeal was a valid exercise of legislative power, on the ground that the abrogated law undertook to invest the company with

rights manifestly inimical to navigation and commerce, in that it assumed to grant away lands subjacent to the navigable waters of the lake. At the same time and in the same case, the court protected the company in its use and enjoyment of its embankment, although it occupied part of the original margin of the lake and the water thereof, and in the maintanance of its docks, subject to the condition that they should not extend into the lake beyond the point of practical navigablity. In *Lewis* v. *Portland*, 25 Or. 133, 168 (35 Pac. 256: 22 L. R. A. 736: 42 Am. St. Rep. 772), the case of *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387 (13 Sup. Ct. 110: 36 L. Ed. 1018), was constructed by this court, in the opinion of the then Chief Justice Lord, not to be in conflict with the doctrine that the State may part with the private title to its tidelands, subject to its sovereign prerogative of so regulating their subsequent use that navigation and commerce upon the navigable waters will not be materially impeded. Another case cited by the defense is *People* v. *Kerber*, 152 Cal. 731 (93 Pac. 878: 125 Am. St. Rep. 93), but it only decides that title by prescription cannot be acquired as against the *jus publicum;* and that the Constitution of the State of California forbade the sale of tidelands situated within two miles of an incorporated town.

*City of Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160 (50 Pac. 277), another case cited by counsel for the defendant, holds that: "The state has full power to alienate lands which are covered and uncovered by the daily flux and reflux of the tides, subject only to the rights of the public to use them for the purpose of navigation and fisheries; and such lands are alienable in private ownership, where capable of reclamation without detriment to the public right, and especially where their reclamation would be of advantage to navigation and commerce." In that very case, Mr. Chief Justice

BEATTY, who wrote the majority opinion, used this language: "A grant by the state of California, therefore, of mud flats and shoals between high and low tide on the margin of the bay of San Francisco cannot be held to have been in excess of the legislative power, in the absence of any proof that such grant has seriously impaired the power of succeeding legislatures to regulate, protect, improve, or develop the public rights of navigation or fisheries, and in this case it does not appear that the grant to Oakland, as here construed, would have that effect, if transferred to a natural person or private corporation." The case turned, not upon the power of the state to convey such lands upon the conditions named, but upon the authority of the city of Oakland to grant away in *solido* the whole of its water front, not only the tide flats, but also beyond the low-water line to the middle of the ship channel. The court very properly construed its charter to give it no such power, neither by its terms nor by implication, because conveyance of the land under the ship channel, or actual navigable water would be hostile to the public right of navigation and commerce.

And so in the other cases cited in opposition to plaintiff's bill. They all recognize the authority of the State to grant the *jus privatum* in its tidelands, which the grantee may hold and enjoy as private property in subordination to the *jus publicum*, continually inherent in the State, to regulate the use of such lands, so that there shall be no material encroachment upon commerce and navigation. It is settled therefore, that the State of Oregon had an estate in the tidelands within its boundaries which was properly the subject of a grant to private parties. It remains to determine whether in the present instance, the State of Oregon has parted with that estate in the lands in question.

6. The terms of the first section of the original act of October 24, 1874, are:

"That there be and is hereby granted to the Willamette Valley & Coast Railroad Company, or its assigns all the tide and marsh lands situated in said county of Benton * * provided, that the said company shall, within thirty days after the passage of this act, file with the Secretary of State their acceptance of said grant * * and that upon the filing of said acceptance as aforesaid the company shall have and become invested with and in absolute title to said lands aforesaid and afterwards to be set apart and designated."

This section remained undisturbed throughout the several enactments dealing with the grant until the act of February 23, 1909, purporting to repeal it. The words of the original section are those of present grant, creating an estate in *praesenti*. It depends upon no condition but the acceptance thereof by the company within 30 days, subject of course to the terms of the act. The required acceptance is conceded and determined by the circuit court to be a fact. In addition to all this, by the act of February 5, 1885 (Laws of 1885, p. 5), the title of the company to lands mentioned in the Acts of 1874, p. 51, and 1878, p. 1, was in so many words ratified and confirmed, and, in the language of section 3:

"This State hereby expressly waives all rights, reserved under the said acts and nothing therein contained and no failure to comply with any of the provisions thereof shall be construed to have worked a forfeiture of any of the grants, rights, privileges or immunities granted or intended to be granted in either of said acts."

This statute is said by defendant's counsel to be of no effect, because its title and first section purport in terms merely to re-enact the former law. This would be a valid objection to the act of 1885, if that were the entire title or all the act itself; for by Section 22, Article IV, Constitution of Oregon:

"No act shall ever be revised or amended by a mere reference to its title, but the act revised or section amended shall be set forth and published at full length."

The title of the act of February 5, 1885, reads thus:

"An act to re-enact and amend an act, approved October 24, 1874, entitled 'An act to provide for the construction of the Willamette Valley & Coast Railroad,' as amended by the act approved October 14, 1878, entitled 'An act to amend an act entitled "An act to provide for the construction of the Willamette Valley & Coast Railroad," approved October 24, 1874', and to confirm the rights of the said railroad company under the said acts."

It is true that the first section of the act of 1885 says, after referring to the former act, that the same "be and the same is hereby re-enacted with the amendments hereinafter specified." For the reasons hereinbefore specified, this much of that act should be held for naught; but, in pursuance of the legislative intention, announced in the title, to amend the previous legislation, section 2 of the act of 1885 reads thus:

"That section 5 of said act, approved October 24, 1874, as amended by the said act, approved October 14, 1878, be and the same is hereby amended so as to read as follows: Section 5. That the time for the completion of the said Willamette Valley & Coast Railroad, by said railroad company, from the tide water on Yaquina Bay to the city of Corvallis, in Benton County, Oregon, be and the same is hereby enlarged and extended for seven years from October 14, 1878."

Sanction for so much of the law of 1885 is found in that part of the title prescribing that this is an act to amend the former legislation. The legislative assembly also announced in the title to the act that it was the intention to confirm the rights of the said railroad company under the said acts, and this formed the proper basis for section 3, already alluded to, confirming the title of the railroad company, and waiving all rights on behalf of the State reserved under the former acts.

7. The only penalty, in the nature of a defeasance of the grant, prescribed in the former legislation, was to the effect that, if the company should fail to complete and equip the road from tidewater on Yaquina Bay to the city of Corvallis within the time specified in the acts, then, in such case, the act conferring the grant should become void, and the property and rights granted to said company should become forfeited to the State. No issue is raised on that question in this case, and no allusion is made to the completion or noncompletion of the road in any of the pleadings here. We therefore have no ground for saying the legislation was void, and hence not the subject of amendment; but, conceding for the argument's sake, that the road was not completed within the time specified by the law conferring the grant, the act of 1885 cured the defect by the waiver of the State of all the rights of forfeiture or defeasance which might accrue to it under a supposed failure of the company to comply with the terms of the grant.

In *Miller* v. *Wattier,* 44 Or. 347, 355 (75 Pac. 209), the court had under consideration the legislation relating to swamplands of the State. The early enactments required the purchaser to reclaim the swamp land either by diking, drainage, or otherwise within 10 years from the issuance of his certificate of purchase, and that, in default of so doing, the title should revert to the State. Subsequent legislation provided that on certain conditions a deed should issue to the purchaser without his having shown reclamation of the land. Commenting upon this stage of the case, the court said: "While it was and is perfectly competent for the State to impose such terms and conditions as it may deem proper, relative to the sale and disposal of its public lands, it could unquestionably, if it saw fit, waive the forfeiture. Whether the land board could make such a waiver without authority from the legislature is not clear. * * Plain-

tiff's cause, however, has not to depend upon that, for
the legislature has itself, by section 5 of the act of 1887
(Laws 1887, p. 10), by explicit and positive declaration,
waived both the reversion and the forfeiture. It applied
to any legal applicant who had complied with the pro-
visions of the act of October 26, 1870 (Laws 1870, p. 54),
including the payment of the 20 per centum of the
purchase price prior to January 17, 1879, and declared
that such a one, without reclamation upon payment of
the balance of the purchase price prior to January 1,
1889, shall receive a deed for the land, provided further,
that no deed shall issue to any one person for more than
640 acres. Plaintiff's predecessor was clearly within
this statute. * * Being relieved of making reclamation,
he has complied with every feature of this late act, and
the waiver of forfeiture in his behalf is operative to
entitle him to a deed." So in this case it was competent
for the legislature to waive the forfeiture and confirm
the title of the company to the tidelands in question,
although they might not have complied strictly with
the terms of the act requiring the completion of the road
within a certain time.

8, 9. Again, the defendants contend that "the
attempted grant, being in the nature of a float, no title
vested in any of the land whatever until surveyed and
designated by the Governor as in the act provided, and
that an officially authorized survey is an indispensable
prerequisite to the passage of title under any general
grant of public lands, within the ordinary rule that
identification of the subject is an essential element in
a transfer of property under any form of conveyance."
"Float" is a term applied to a grant of land by the
government, the land not having been specifically
selected; that is, a general grant of a certain amount
of land to be selected in the future by the grantees.
3 Words and Phrases, 2850, and authorities there noted.

In support of this phase of the defendant's contention, they have cited two classes of cases, one depending upon the construction of the laws of the United States relating to swamp lands, and the other upon statutes granting to railroads lands to be within certain distances of the line of the road thereafter to be laid out. A type of the first class of cases is that of the *Rogers Locomotive Machine Works* v. *American Immigrant Co.*, 164 U. S. 559, 570, (17 Sup. Ct. 188: 41 L. Ed. 552). The issue before the court in that case was whether the land in question there was subject to the provisions of the swamp land act of Congress of September 28, 1850, or the act of Congress of May 15, 1856, granting land to Iowa to aid in the construction of various railroads in that state. In the swamp land act, there were words of present grant; but there were also other conditions, requiring the Secretary of the Interior to make out accurate lists and plats of such land and transmit them to the Governor of the state, upon whose request therefor the Secretary of the Interior was required, in the language of the statute, to "cause a patent to be issued to the State therefor and on that patent the fee simple to said lands shall vest in the State." The general government, as well it might, prescribed various conditions necessary to the completion of the process of diverting its title to the swamp lands from itself to the State, and it had a right to require that until all those conditions were met and satisfied the title should not pass. This it did when it said in the statute that "on that patent the fee simple to said lands shall vest in the state." Here, however, no such conditions are imposed. By the very words of the statute, the land is granted, and the title inures to the company on its acceptance of the grant under the terms of the act. A characteristic example of the other class of cases relied upon by the defendant on this phase of

the case is *Wisconsin R. Co.* v. *Price County,* 133 U. S.
496 (10 Sup. Ct. 341: 33 L. Ed. 687). In that case
the United States government had granted to the state
of Wisconsin, for the purpose of aiding in the construc-
tion of a railroad, every alternate section of public land,
designated by odd numbers, for ten sections in width
on each side of the road to be thereafter located, and
provided that no patent should issue for the land, except
as the road should be laid out and completed in sections
of 20 miles. It is manifest that there was no standard
of identification for any of these lands until the road
was so laid out and established; and hence the location
and construction of the road was a condition precedent
to the acquisition of title to the land.

As before pointed out, such cases can have no appli-
cation to the matter in hand. The land in question here
is specifically designated as the tide and marsh lands
in Benton County. Its identity is demonstrated by the
daily action of the sea and cannot be questioned, as that
is certain which can be made certain. For instance,
the following descriptions have been pronounced effect-
ual to pass title by deed: "All my right, title and inter-
est in Sacramento City, Upper California, consisting of
town lots and buildings thereon." *Frey* v. *Clifford,* 44
Cal. 335. "Lots 3 and 4 block 18, A. H." *Flegel* v.
*Downing,* 54 Or. 40 (102 Pac. 178: 135 Am. St. Rep.
812). "All real estate, water rights and property of
every description real or personal in the state of Nevada
belonging to the parties of the first part, or either of
them." *Brown* v. *Warren,* 16 Nev. 228. "And all other
lands, tenements and hereditaments belonging to the
said William, Earl of Sterling, within the province of
New York." *Jackson* v. *De Lancey,* 11 Johns. 365. "All
the lots that he then owned in the town of Frankfort
whether he had a legal or equitable title thereto."
*Starling* v. *Blair,* 4 Bibb (Ky.) 288. "Also together

with all other lands, that may not have been hereto-
fore described, belonging to said South Park Company."
*Clifton Heights Land Co.* v. *Randell,* 82 Iowa 89 (47
N. W. 905). "The entire undivided one-half of all my
land in Texas." *Witt* v. *Harlem,* 66 Tex. 660 (2 S. W.
41).

It is true that it is provided in the legislation under
consideration that when a commission had reported
that 10 miles of road had been completed the Governor
of the State will cause the land herein granted to be
surveyed, designated, and set apart for the benefit of
said company; but it is not provided in the act anywhere
that the title of the company depends upon the survey
of the lands. The completion of the road is the only
condition precedent to the requirement of the survey.
It is admitted by the pleading that 10 miles of the road
were finished, and that a commission, appointed for that
purpose, had reported the same to the Governor.' Tak-
ing all the terms of the statute together, the condition
that the Governor should cause the land to be surveyed
is a mere gratuity or part of the grant, and does not
affect the title passed by the terms of the law. In the
absence of plain words postponing the taking effect of
the grant to the time when the survey should have been
completed, it would be unjust to hold that the mere
default of the Governor, whether designedly or for want
of funds, should defeat the title which was granted in
express words in the first section of the act.

10. We conclude, then, that so far as the *jus privatum*
of the State in the tidelands mentioned is concerned,
the State has parted with its title to the Willamette
Valley & Coast Railroad Company, of which the plaintiff
here is by mesne conveyances admitted to be the suc-
cessor in interest. So far as the State had private
property in the land at the time of the legislation
referred to, the plaintiff now has the same private prop-

erty in those lands. In the language of Mr. Justice WOLVERTON, in *Salem Mills Co.* v. *Lord*, 42 Or. 82 (69 Pac. 1033: 70 Pac. 832). "The State under the constitution, can no more exercise authority over property not its own, except through some recognized process, such as the right of eminent domain, than an individual. If this was not the rule, confiscation would follow, and the State could, without the semblance of right, deprive its citizens of their property without due process of law, contrary to the fourteenth amendment of the federal constitution." As before pointed out, no legislation can impair the *jus publicum* of the State in the lands under consideration. Its sovereign authority over them is undiminished and unaffected by any of the statutes mentioned. The right of the State so to regulate the use of tidelands as not materially to impede the public right of navigation is a constant factor in every title relating to such land, but regulation is not confiscation. Section 18, Article I, Constitution of Oregon, says:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in case of the State, without such compensation first assessed and tendered.

The repealing act of 1909 does not profess to regulate the use of those lands. Its plain purpose is to destroy the previous legislation, and, in effect, attempts to confiscate the lands already granted by the State.

In the case of the *Atlantic Coast Line R. Co.* v. *North Carolina Corporation Commission*, 206 U. S. 1, 20 (27 Sup. Ct. 585, 592: 51 L. Ed. 933), the court says: "It has been settled that the right of ownership of railway property, like other property rights, finds protection in the constitutional guaranties; and therefore, wherever the power of regulation is exerted in such an arbitrary and unreasonable way as to cause it to be, in effect,

not a regulation, but an infringement upon the right of ownership, such an exertion of power is void, because repugnant to the due process and equal protection clauses of the fourteenth amendment." If regulation, so called, which amounts to a practical infringement of the rights of property falls within the ban of the constitution, equally abhorrent in an act which is nothing less than confiscation, pure and simple.

With the wisdom or folly of the legislation in the question, we have nothing to do. It may have been popular at that time for the legislature to engage in a project of promoting an additional outlet for the products of the State, by which they might go unhindered to the sea. At this time it might be popular if we should declare that the whole grant was properly confiscated; but popularity is not the rule when the law is to be declared. Having once deliberately granted away the title to the land in question, the State cannot recall the grant, except by the exercise of eminent domain, with provision for compensation, any more than an individual can deliberately avoid his free act and deed. Neither can the legislature arbitrarily take the property of one individual and give or sell it to another.

11. We conclude that the act of February 23, 1909, purporting to repeal material parts of the legislation respecting the grant in question, is in violation of the terms of the constitution and affords no protection to the defendants in their avowed purpose of selling part of the land so granted, and *Salem Mills Co.* v. *Lord,* 42 Or. 82 (69 Pac. 1033: 70 Pac. 832), is authority for enjoining them in such an attempt.

The decree of the circuit court is reversed, and one entered here in accordance with the prayer of the complaint.                    REVERSED: DECREE RENDERED.