Argued April 29, affirmed in part; reversed in part and remanded
August 17, reconsideration denied November 7, 1977 (see 31 Or App 491),
petition for review allowed April 11, 1978

BRUSCO TOWBOAT CO. et al, *Appellants,*
*v.*
STATE ex rel STATE LAND BOARD,
*Respondent.*
(No. 412016, CA 6407)

STATE OF OREGON, *Respondent,*
*v.*
FORT VANCOUVER PLYWOOD CO., *Appellant.*
(No. 406393, CA 6407)

PORT OF ASTORIA et al, *Appellants,*
*v.*
STATE ex rel STATE LAND BOARD, *Respondent.*
(No. 412017, CA 5989)
(Cases consolidated)
567 P2d 1037

[ 510-a ]

[ 510-b ]

Alex L. Parks, Portland, argued the cause for appellants. With him on the briefs were Malcolm J. Montague, Clemens E. Ady and White, Sutherland, Parks & Allen, Portland.

James C. Rhodes, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were James A. Redden, Attorney General, W. Michael Gillette, Solicitor General, and Peter S. Herman, Senior Counsel, Salem.

Jane Hotneier and Jan Pauw, Tacoma, Washington, filed a brief amicus curiae for Weyerhaeuser Company.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

TANZER, J.

## TANZER, J.

The basic issue in each of these three consolidated cases is the validity of rules promulgated by the State Land Board requiring users to enter into leases and to pay rent for the use of submerged and submersible lands underlying navigable waterways throughout the state.[1]

The first case, an action in ejectment, was commenced by the Board against the Fort Vancouver Plywood Company to compel it either to enter into a lease for or to vacate submerged lands which it used for a log boom. It was treated below as a suit for declaratory judgment and it will be so treated here. The other two cases are suits for declaratory judgment commenced by various tugboat companies and by several port districts seeking to have the Board's leasing program declared invalid. Judgments in all three cases upheld the lease program and this appeal followed. For convenience, all parties challenging the leasing program will be referred to herein as plaintiffs.

## I. THE RULES

The rules in issue establish a program for leasing state-owned submerged and submersible lands:

> "Any person engaged in a permanent or long-term use of state-owned submerged or submersible lands not exempted from leasing by statute or these regulations must obtain a lease from the Division. * * *" OAR 141-82-015(1).

Under the program, leases are required for most long-term uses of submerged and submersible lands which effectively preclude any other use and enjoyment of such lands and the overlying waters. Thus,

---

[1] Submerged lands are lands which lie below the ordinary low-water mark of navigable waters. Submersible lands are lands which lie between the ordinary low-water mark and the ordinary high-water mark in navigable waters, and all other islands, shore lands or other lands held by or granted to the states by virtue of her sovereignty. The terms submerged and submersible lands are used with reference to both tidal and nontidal waters. ORS 274.005(7) and (8).

leases are required for most industrial and commercial uses including log booms, aquatic cultivation facilities and marinas, as well as for private uses such as houseboat moorages and private docks.[2]

The rules exempt from the lease program uses which are essentially navigational or in aid of navigation, such as vessels which are temporarily anchored or hove to and temporary log tie-ups. Buoys, channel markers and beacons authorized by state or federal authorities are also exempt.[3] In addition, the legislature has conferred upon riparian owners certain wharfing privileges which are not subject to the lease program. ORS 780.040 provides:

"(1) The owner of any land lying upon any navigable stream or other like water, and within the corporate limits of any incorporated town or within the boundaries of any port, may construct a wharf upon the same, and extend the wharf into the stream or other like water

---

[2]OAR 141-82-010(2) provides:

"Uses of state-owned submerged and submersible lands which require leases include, but are not limited to:

"(a) Aquaculture projects involving the cultivation of aquatic plants and animals for domestic or commercial purposes.

"(b) Industrial and/or commercial business areas.

"(c) Houseboats and houseboat moorages.

"(d) Commercial and workboat moorages.

"(e) Class I marinas.

"(f) Class I private docks, floats, and boathouses.

"(g) Log storage or booming areas including millside log boom areas (both makeup and breakdown areas).

"(h) Other uses not exempted by law."

Class I facilities are defined as facilities having a surface area greater than 1,000 square feet or an effective use area of greater than 3,000 square feet. All other facilities are classified as Class II facilities. OAR 141-82-005(17).

[3]OAR 141-82-010(3) provides:

"Uses which do not require leases include, but are not limited to:

"(a) Vessels engaged in navigation or navigational aids.

"(b) Temporary log tieups.

"(c) Class II marinas.

"(d) Class II private docks, floats, and boathouses.

"(e) Material removal leases under ORS 274.550 and 274.530.

"(f) Public boatramps—providing that only a nominal fee to cover maintenance of the facility is charged for use by the public.

"(g) Uses exempted by law."

beyond low-water mark so far as may be necessary for the use and accommodation of any ships, boats or vessels engaged exclusively in the receipt and discharge of goods or merchandise or in the performance of governmental functions upon the stream or other like water.

"(2) As used in this section, 'wharf' does not include new lands created upon submersible or submerged lands by artificial fill or deposit."

Under the rules, the leasing process is initiated by filing an application with the Board, OAR 141-82-015(1), which then establishes a minimum annual rental for the parcel sought. OAR 141-82-020(1)(d); ORS 274.040(6). Owners of land abutting the parcel are then notified that they have 14 days in which to exercise their statutory right to lease the land at the minimum rental. OAR 141-82-020(1)(e); ORS 274.040(2). If abutting landowners fail to exercise this right, the parcel is opened to competitive bidding. OAR 141-82-020(1)(f). The Board may reject lease applications which it deems to be contrary to the public interest. OAR 141-82-025(1). The Board is authorized, but not required, to conduct public hearings on the question of whether to issue a particular lease. OAR 141-82-020(2). Leases may be for a period of up to 20 years. OAR 141-82-030.

The construction of permanent facilities such as those subject to the Board's lease program requires a permit from the United States Army Corps of Engineers. Issuance of such a federal permit is without prejudice to rights of the state regarding construction. Conversely, the Board's rules provide that a lease from the state does not obviate the need for compliance with the Corps of Engineers' permit requirement. OAR 141-82-025.

All of the plaintiffs, in connection with the ordinary conduct of their business, maintain permanent facilities overlying submerged and submersible lands which are not exempted from the Board's leasing program. With minor exceptions, these facilities preclude the public's use and enjoyment of the lands and

waters which overlie them. At least some of the plaintiffs are riparian landowners.[4]

Plaintiffs challenge the validity of the Board's leasing program on several grounds. They contend that the state's proprietary interest in submerged and submersible lands underlying navigable waters does not empower it to convey leasehold interests in such land to private parties. The riparian landowner plaintiffs argue that they have the right to erect structures in aid of navigation on submerged and submersible land and that the charging of rent for the exercise of that riparian right is an unlawful taking of property without compensation. Plaintiffs also contend that the leasing program is beyond the statutory authority of the State Land Board and that the program violates various provisions of the Oregon and United States Constitutions.

Resolution of these challenges requires that we draw the line which separates the opposing property rights of the state and of the riparian owners. That in turn requires an understanding of the nature and extent of each.

## II. THE STATE'S OWNERSHIP OF SUBMERGED AND SUBMERSIBLE LANDS

A. *The Nature of the State's Interest*

The sovereign interest of the State of Oregon in submerged and submersible lands underlying navigable waters is substantially the same as that enjoyed at common law by the English king. Although the existence of the interest is well settled, its origin and its precise nature is obscured by an historical sequence of cases, most of which deal peripherally and imprecisely with the interest of the sovereign.

Under English common law, title to lands underlying tidal waters was held by the king as an element of sovereignty. After the American Revolution, each of

---

[4] A riparian landowner is one who owns land which is bounded by a waterway. Black's Law Dictionary 1490 (Rev. 4th Ed 1968).

the original colonies assumed its own sovereign powers, one aspect of which was ownership of all submerged and submersible lands underlying navigable waters.[5] *Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894); *Mumford v. Wardwell,* 73 US (6 Wall) 423, 18 L Ed 756 (1867); *Pollard's Lessee v. Hagan et al.,* 44 US (3 How) 212, 11 L Ed 565 (1845); *Martin v. Waddell,* 41 US (16 Pet) 366, 410, 10 L Ed 997 (1842). Title to such land was not surrendered to the federal government upon adoption of the constitution. Rather, by virtue of the Tenth Amendment,[6] it was reserved to the states, subject only to limitations imposed by expressly conferred federal powers, such as the regulation of interstate commerce. *United States v. Holt Bank,* 270 US 49, 46 S Ct 197, 70 L Ed 465 (1926); *Scott v. Lattig,* 227 US 229, 33 S Ct 242, 57 L Ed 490, 44 LRA (ns) 107 (1913); *Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894); *Mumford v. Wardwell,* supra.

■ By the terms of the Oregon Admission Act, Oregon entered the union "on an equal footing with the other states * * *." Thus, upon its admission in 1859, title to submerged and submersible lands underlying navigable waters devolved upon the state as sovereign.[7]

---

[5]In England, the king's ownership extended to tidal waters and underlying lands but not to nontidal waterways. This may be because, in England only tidal waterways are navigable. *See,* Advisory Committee to the Oregon State Land Board, *Oregon's Submerged and Submersible Lands* 15 (1970). In this country, navigability is not dependent upon tidal influence. Thus, it has long been recognized that states' ownership of submerged and submersible lands extends to lands underlying all waterways which are navigable in fact. *Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894). For a discussion of the definition of navigable *see* Leighty, *The Source and Scope of Public and Private Rights in Navigable Waters,* 5 Land and Water L Rev 391 (1970).

[6]The Tenth Amendment to the United States Constitution provides:

"The powers not delegated to the United States by the Constitution nor prohibited by it to the States are reserved to the States respectively, or to the people."

[7]Much of plaintiffs' argument concerning the state's ownership is based upon the erroneous assumption that ownership of the land does not confer title to the overlying waters. The state is the owner of both the

*Oregon v. Corvallis Sand & Gravel Co.,* 429 US 363, 97
S Ct 582, 50 L Ed 2d 550 (1977); *Bonelli Cattle Co. v.
Arizona,* 414 US 313, 94 S Ct 517, 38 L Ed 2d 526
(1973); *United States v. Holt Bank,* 270 US 49, 46 S Ct
197, 70 L Ed 465 (1926); *Scott v. Lattig,* supra; *Shively
v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894);
*Smith Tug v. Columbia-Pac. Towing,* 250 Or 612, 443
P2d 205 (1967).

█   The state's ownership of submerged and submers-
ible land is not, however, limited to the incidents of
legal title. Rather, it is comprised of an interrelation-
ship of two distinct aspects, each possessing its own
characteristics.

As sovereign, the state holds full proprietary rights
in such land; it is invested with a fee simple title. This
first element of the state's interest is called the *jus
privatum. See, Shively v. Bowlby,* 152 US 1, 11, 14 S Ct
548, 38 L Ed 331 (1894).

Dominion, as opposed to title, over submerged and
submersible lands, as a natural resource, is invested in
the state in its capacity as the public's representative.
The state holds such dominion in trust for the public.
This second aspect of the state's ownership is called
the *jus publicum. See, Shively v. Bowlby, supra,* 152
US at 11.

The state's *jus privatum* interest is a construct of
English common law. It is the traditional legal pro-
prietary right of private ownership. It is axiomatic
that within the common law property system all land
must be owned by someone. Since submerged and
submersible lands are incapable of ordinary private
occupation and improvement and since their common
uses are essentially public in nature, full legal owner-
ship in fee simply devolved upon the sovereign. *See,*

navigable waters and the underlying land. *Port of Seattle v. Oregon & W. R.
R.,* 255 US 56, 63, 41 S Ct 237, 65 L Ed 500 (1921). The discussion herein
regarding the nature of the state's interest in the land is equally applicable
to its ownership of the water.

*Shively v. Bowlby, supra,* 152 US at 11. Such owner-
ship includes the most important aspect of the fee
simple, the power of alienation. This was recognized in
*Corvallis & Eastern R. Co. v. Benson,* 61 Or 359,
369-70, 121 P 418 (1912):

> "* * * [The *jus privatum*] is a species of private
> property which a state holds in the same way that an
> individual citizen owns land which he has acquired from
> the United States by any of the methods provided for the
> sale of the public domain, or from any private person by
> purchase and conveyance. This private property in tide-
> lands, the State by its legislative assembly, may grant to
> any one in any manner, or for any purpose, not forbidden
> by the constitution, and the grantee will thereby take
> the title described in the grant as absolutely as if the
> transaction were between individuals; one conveying his
> private lands to the other. * * *"

*Accord: Port of Seattle v. Oregon & W. R. R.,* 255 US
56, 63, 41 S Ct 237, 65 L Ed 500 (1921).

The *jus publicum* aspect of the state's ownership is
rooted in a philosophical conception of natural law.
The principle that the public has an overriding inter-
est in navigable waterways and lands underlying
them is as old as the waterways themselves, traceable
at least to the Code of Justinian in the Fifth Century
A.D. *See,* Advisory Committee to the State Land
Board, Oregon's Submerged and Submersible Lands
15 (1970). Navigable waterways are a valuable and
essential natural resource and as such all people have
an interest in maintaining them for commerce, fishing
and recreation. The right of the public to use the
waterways for these purposes has always been recog-
nized at common law. *See, Shively v. Bowlby, supra,*
152 US at 14. As representative of the people, the
sovereign bears the responsibility to preserve these
rights. *Shively v. Bowlby, supra,* 152 US at 11; *Illinois
Central Railroad v. Illinois,* 146 US 387, 452, 13 S Ct
110, 36 L Ed 1018 (1892); *Cook v. Dabney,* 70 Or 529,
532, 139 P 721 (1914). Unlike the state's *jus privatum*
interest, the *jus publicum* cannot be alienated. The

Oregon Supreme Court recognized this distinction in *Corvallis & Eastern R. Co. v. Benson,* 61 Or 359, 370, 121 P 418 (1912):

"The State, however, cannot abdicate or grant away the other element of its title to tidelands—the *jus publicum,* or public authority over them. This is the dominion of government or sovereignty in the State, by which it prevents any use of lands bordering on the navigable waters within the State which will materially interfere with navigation and commerce thereon. For, by the tenets of the common law, as well as by the terms of the act of Congress of February 14, 1859, c. 33, 11 Stat. 383, admitting Oregon as a state into the Union, the rivers and waters forming a boundary between it and other states 'and all the navigable waters of said State shall be common highways and forever free as well to the inhabitants of said State as to all other citizens of the United States.' "

In essence, the *jus publicum* is a nondelegable government obligation. Regardless of how the state may choose to convey its private title to submerged and submersible lands, such title, even in the hands of a private party, remains subject to the paramount power of the state to intervene on behalf of the public interest.

This division of the state's interest into two parts, one alienable and one not, is consistent with English common law:

"* * * The king acquired his ownership as a prerogative of his sovereignty and held these lands subject to the *jus publicum* but with full power to convey title. The disputed question in the English cases was not whether the crown could grant the fee to underwater lands but as to the uses to which they would still be subject in the hands of its grantees. Are not the American decisions working back to this historic principle—a recognition of a *jus privatum* in the state, with reasonable powers of alienation, but qualified by a *jus publicum* * * *?" (footnotes omitted.) 3 Casner, American Law of Property 268 (1974).

It is also an implicit conclusion of the leading

[ 518 ]

decisions of the Oregon Supreme Court. *See, Smith Tug v. Columbia-Pac. Towing,* 250 Or 612, 622, 443 P2d 205 (1967); *State Land Board v. Sause et al,* 217 Or 52, 74, 342 P2d 803 (1959); *Corvallis & Eastern R. Co. v. Benson, supra; Bowlby v. Shively,* 22 Or 410, 30 P 154 (1892), *aff'd* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894).

■ We hold, therefore, that the state has a proprietary interest sufficient to empower it to convey to private parties leasehold interests in submerged and submersible lands underlying navigable waters. The granting, withholding and management of such leaseholds, however, as exercises of the state's proprietary rights, remain subject to the public's paramount interest in such lands and the state, as trustee of that interest, must act accordingly.

B. *Statutory Authority for the Lease Program*

The next issue is whether the State Land Board is authorized to exercise the state's proprietary interest by leasing submerged and submersible lands pursuant to its rules. Plaintiffs contend that the constitutional and statutory provisions under which the Board acts do not provide such authority.

Article VIII, § 5(2) of the Oregon Constitution, provides broadly:

"The board shall manage lands under its jurisdiction with the object of obtaining the greatest benefit for the people of this state, consistent with the conservation of this resource under sound techniques of land management."

This section is a constitutional expression of the *jus publicum* or public trust aspect of the state's ownership. It has been legislatively implemented in ORS 273.031, which assigns responsibility for its effectuation to the State Land Board:

"The board shall carry out the duties prescribed by section 5, Article VIII of the Oregon Constitution and such other duties as are imposed upon it by law."

[ 519 ]

The state's *jus privatum* interest in submerged and submersible lands is placed by statute under the control of the Board. *See generally,* ORS ch 273 and 274.

In view of the broad constitutional and legislative delegation of power under which the Board operates, it could reasonably conclude that sound management with the object of obtaining the greatest benefit for the people dictates that persons, private businesses or public agencies which use state-owned lands to the exclusion of the public should compensate the state for such use.[8] Indeed, the *jus publicum* to which the state's

---

[8] In addition to the general authority to lease state-owned submerged and submersible lands, there are specific statutes which, on their face, appear to authorize the Division of State Lands to sell or lease such lands for appropriate purposes. ORS 274.040(1) authorizes the Division to lease state-owned submersible lands:

"Except as provided in subsection (1) of ORS 274.530 for leases of submersible lands of less than one year's duration and in subsections (2) and (3) of this section, submersible lands owned by the State of Oregon may be leased only to the highest bidder, bidding at least the minimum amount designated by the division under subsection (6) of this section for the lease of any such lands, after being advertised not less than once each week for two successive weeks in one or more newspapers of general circulation in the county in which the lands are situated. However, any owner of lands abutting or fronting on such submersible lands shall have the preference right to lease such lands for the amount designated by the division under subsection (6) of this section as the minimum amount for the lease of any such lands. This preference applies to any lease of submersible land for one year or more offered or issued under ORS 274.530. This preference does not apply as to any lease offered or issued by the division under ORS 274.615 or 274.705 to 274.860."

ORS 274.915, although apparently intended to authorize the sale or lease of fill lands also seems to authorize the sale or lease of submerged and submersible lands:

"Except as otherwise provided in ORS 274.905 to 274.940, the division may sell, lease or trade submersible or submerged lands owned by the state and new lands created upon submersible or submerged lands owned by the state in the same manner as provided for submersible lands in ORS 273.006 to 273.435, 273.505 to 273.551, 273.605 to 273.761, 273.805 to 273.990, 274.005 to 274.025, 274.040 to 274.925, 274.935, 274.940 and 274.990."

Plaintiffs contend that these statutes apply only in the context of subsoil and mineral rights. However, in *Smith Tug v. Columbia-Pac. Towing,* 250 Or 612, 443 P2d 205 (1967), the Supreme Court implicitly accepted, without discussion, the Board's authority to lease state-owned submersible lands for log storage.

proprietary interest in submerged and submersible land is subject, implies an obligation for the Board to seek compensation for the exclusive private use of a public resource. The payment of compensation serves the public interest by increasing the common wealth. Thus, through such compensation, the public derives benefit from leased submerged and submersible lands although it gives away their direct use.

■■  We tend to defer to an agency's interpretation of the statutes which it administers, particularly where, as here, the statutory grant of authority under ORS 273.031 is broad, *Fairview Hospital v. Moore,* 28 Or App 637, 640, 560 P2d 671 (1977). The rules establishing a lease program are reasonably calculated to effect the constitutional and statutory purpose. Accordingly, we conclude that the lease program is constitutionally and statutorily authorized.

### III.  RIPARIAN RIGHTS

Our examination of the nature of the state's interest has led us to conclude that the state may exercise its rights. To determine whether that exercise is a taking for which compensation must be paid, requires a similar examination of the nature of the rights of the riparian owners.

### A *The Nature and Type of Riparian Rights*

■■  At common law, riparian landowners, by reason of their adjacency to the waterway, were accorded certain rights additional to those of the public in general. The nature and extent of riparian rights is determined by state law, *Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894); *see also, Oregon v. Corvallis Sand & Gravel Co.,* 429 US 363, 97 S Ct 582, 50 L Ed 2d 550 (1977), and although the states differ in their enumeration of these rights, it is generally agreed that they include access to the navigable portion of the stream. This right of access includes the right to wharf out and to build docks or booms. These riparian rights are still recognized in states where the common law has not

been legislatively altered. *See,* 1 Farnham, *Waters and Water Rights* 278 (1904).

In Oregon, the legislature has codified the right of riparian owners to wharf out by enactment of ORS 780.040, which authorizes the erection of structures used for the loading and unloading of cargo and passengers. *See, Port of Portland v. Reeder et al,* 203 Or 369, 384, 280 P2d 324 (1955). Such structures are exempted by rule from the lease program. The statute does not express any right to build other structures such as log booms, piers and docks which do not fall within the narrow definition of wharf. Of these rights, the statutes are silent, but the Supreme Court has spoken.

The Supreme Court has consistently recognized the right of riparian property owners to build certain structures other than wharves in aid of navigation in the waters bordering their land:[9] *Smith Tug v. Columbia-Pac. Towing,* 250 Or 612, 637, 443 P2d 205 (1967) ("This includes the right to build structures on the bed below the low-water mark and the right to moor logs on the water."); *State Land Board v. Sause et al,* 217 Or 52, 74, 342 P2d 803 (1959) (maintenance of a log dump); *Coquille M. & M. Co. v. Johnson,* 52 Or 547, 551, 98 P 132 (1908) (wharves, piers, landings and booms); *Montgomery v. Shaver,* 40 Or 244, 248, 66 P 923 (1901); *Bowlby v. Shively,* 22 Or 410, 30 P 154 (1892), *aff'd* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894). This extended right to navigational structures is founded in the absence of statutes to the contrary,

---

[9] Although early cases seemed to treat the riparian owner's right as being qualitatively different depending upon whether his land abutted tidal waters or fresh water, it appears that the rights of the riparian owner are the same so long as the abutting waterway is navigable. *See, Smith Tug v. Columbia-Pac. Towing,* 250 Or 612, 443 P2d 205 (1967).

We use the word "right" here in a general sense, rather than in distinction to "privilege." The Supreme Court cases upon which we rely do not require the making of a distinction between "right" and "privilege" and we infer that they also use "right" in its more inclusive sense. Hereinafter, we use "privilege" narrowly and "right" broadly or narrowly as the context requires.

rather than in any statutory grant. It is thus a common law right subject to, but as yet unaffected by, legislation.

■ Although proprietary riparian rights may be regulated, they may not be eliminated without the payment of compensation. Such elimination would constitute a taking for which process is due. *See,* 5 Clark (ed), *Waters and Water Rights* 375 (1972); 1 Farnham, *Waters and Water Rights* 282 (1904); Note, *The Constitutional Sanctity of a Property Interest in a Riparian Right,* 1969 Wash Univ Law Q 327 (1969). Plaintiffs, as riparian owners, argue that since the Board's lease program would require them to pay for or else lose the same privileges which they heretofore enjoyed as a matter of common law right, the program results in an uncompensated, and thus unconstitutional, taking of those riparian rights. This contention, however, is predicated upon a misperception of the nature of riparian rights and privileges to build structures on submerged and submersible land.

■ Although commonly viewed as a unitary collection of co-equal rights and privileges, riparian rights are actually a cluster of distinct prerogatives which are of two general types. For the most part, riparian rights arise naturally from the fact that one's land is adjacent to water. The benefit of having one's land washed by water is inherent in the ownership of the land itself. It does not depend on the acquiescence or goodwill of the state. These inherent benefits may be referred to as *proprietary rights.* They include the right to have the stream continue in place and the right to make proportionate use of it while the water flows past one's land. Such proprietary rights include, for example, access to navigable water and the owner's household use of water. These rights which inhere in the land cannot be taken away by the state without just compensation, 1 Farnham, *Waters and Water Rights* 281 (1904). The Board's rules do not require leases for such proprietary rights.

[ 523 ]

The other "rights" accorded to riparian owners are not inherent in their ownership of the land. Rather, they are privileges which are extended or tolerated by the state because of the riparian owners' favorable situation of ready access to the water and because of a presumed benefit to the public arising from the private exercise of the rights. This class of riparian rights includes, for example, the privilege to build structures in aid of navigation, such as those here in issue, on submerged and submersible land. These privileges are not proprietary rights and they may not be insisted upon against the will of the state. 1 Farnham, *Waters and Water Rights* 281 (1904); 36 Op Atty Gen 150 (Or 1972).

The distinction between proprietary riparian rights which exist by natural law as a characteristic of the land and nonproprietary riparian privileges which are incidents of law conferred upon riparian owners has never been expressly articulated by the Supreme Court, although it was discussed in the concurring opinion of McBride, C. J., in *Re Water Rights of Hood River,* 114 Or 112, 188, 227 P 1065 (1924). That case upheld the 1909 Water Code against contentions by riparian owners that its dilution of their alleged riparian rights constituted an unconstitutional taking. With respect to the alleged rights of Pacific Power and Light to use water for the generation of power, the Chief Justice observed:

"The riparian rights to water, or to the use of water, may be divided into two classes—natural uses, and other uses which may be deemed extraordinary. Natural uses, which I deem to be those that vest in a riparian proprietor at the very moment that he obtains title to land bordering on a natural stream, include the use of water for domestic purposes of his home or farm, such as drinking, washing or cooking, or for his stock. These might well be construed to extend to all culinary and household purposes, even to the watering of a garden and things of that character, and, so far as irrigation is concerned, the watering of a small garden is about the extent of use to which any kind of irrigation was put at

[ 524 ]

the time of the common law. All other uses are extraordinary, and may be classed rather as privileges than as rights, and, as to such, I do not believe the theories of the common law should be applied." 114 Or at 190.

The distinction between proprietary rights and nonproprietary riparian privileges, though not elsewhere articulated, has been implicit in the court's reasoning in decisions dealing with the right to erect structures on submerged and submersible land. In those cases, the court has consistently referred to the right to erect navigational structures as a passive or implied license which exists only so long as the state permits it. The court has emphasized that the right should be treated as a usufruct rather than as a property interest. In the leading case on this subject, *Coquille M. & M. Co. v. Johnson,* 52 Or 547, 98 P 132 (1908), the court held that riparian owners could construct wharves, piers, landings and booms, but made it clear that this right was subject to divestment, at least until it was exercised.

"* * * But 'riparian owners upon navigable fresh rivers and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and booms, in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank, and not upon title to the bed of the river. Its exercise may be regulated or prohibited by the State; but, so long as not prohibited, it is a private right, derived from a passive or implied license by the public. * * *'" 52 Or at 551.

*See also, Smith Tug v. Columbia-Pac. Towing,* 250 Or 612, 443 P2d 205 (1967); *State Land Board v. Sause et al,* 217 Or 52, 342 P2d 803 (1959).

Similarly, the Supreme Court has held that the statutory right to wharf out is only a license which may be revoked at any time until it is exercised. *Montgomery v. Shaver,* 40 Or 244, 248, 66 P 923 (1901); *Bowlby v. Shively,* 22 Or 410, 30 P 154 (1892).

The Supreme Court's analysis based on license is consistent with the longstanding common law rule.

Access to the navigable portion of a waterway was deemed to be a proprietary riparian right analogous to that enjoyed by an abutter on a highway. It did not encompass the privilege to erect structures on submerged and submersible land. *Shively v. Bowlby,* 152 US 1, 9-10, 14 S Ct 548, 38 L Ed 331 (1894). Every structure which was erected below the high-water mark without license was a mere purpresture which could, at the suit of the sovereign, be either removed or demolished. *See, Shively v. Bowlby, supra,* 152 US at 9-10.

B. *The Power to Revoke Exercised Licenses*

Because the privilege to erect structures in aid of navigation is in the nature of a license rather than a proprietary interest, the elimination of that privilege without the payment of compensation is not an unconstitutional taking under either the United States or Oregon Constitution. We are therefore not concerned with the law of eminent domain. Rather, the power of the state to eliminate this nonproprietary riparian privilege and the limits upon that power must be determined according to general property law governing the revocability of licenses. Therefore, we look first to the general nature of licenses, and then to the interplay between the freedom of the licensor to revoke and the protection accorded to the licensee's investment.

A license is the authority to do without charge an otherwise wrongful act on another's land for the benefit of the licensee. The grant of a license does not convey any estate in land. *Forsyth v. Nathansohn,* 139 Or 632, 636, 9 P2d 1036, 11 P2d 1065 (1932). Before it has been exercised, a license is revocable at the will of the licensor. *Rouse v. Roy L. Houck Sons',* 249 Or 655, 660, 439 P2d 856 (1968); Restatement of Property § 519 (1944). Thus, a riparian landowner's license to wharf out and erect other navigational aids has been held "revocable at the pleasure of the legislature until acted upon." *Montgomery v. Shaver, supra* at 248; *Bowlby v. Shively,* 22 Or 410, 30 P 154 (1892).

[ 526 ]

■ The general law of licenses provides that a licensee who has expended labor and capital in the exercise of his license in reasonable reliance upon its continued availability, is privileged to continue the use permitted by the license to the extent reasonably necessary to realize upon his expenditures. Restatement of Property § 519(4) (1944). This proposition from the Restatement was recognized expressly in *Rouse v. Roy L. Houck Sons', supra* at 660, and implicitly in the riparian case of *Montgomery v. Shaver, supra.*

The riparian plaintiffs herein have made substantial investments in the exercise of their licenses and in reliance upon their continuing availability. Such reliance is reasonable in view of the fact that for nearly a hundred years the law of this state, as expressed by the Supreme Court, has affirmatively recognized the existence of a riparian right to erect navigational aids. The existence of this nonproprietary right must be regarded as affirmatively established at common law and the legislature has heretofore neither modified nor withdrawn it.[10] Therefore, absent some reason for holding the general rule inapplicable in this context, the right of the state to revoke riparian licenses is limited by the right of the licensees to recover their as yet unrecouped investments.

■ The rule that a license is made irrevocable by reliant investment is essentially one of equitable

---

[10] In Oregon, it has been held that a license is not made irrevocable by reliant investment if the license arises from silence or passive acquiescence rather than from affirmative representations. *Heisley et al. v. Eastman et al.,* 102 Or 137, 201 P 872 (1921); *Shaw v. Proffitt,* 57 Or 192, 109 P 584, 110 P 1092 (1910). It has been suggested, in an Attorney General's opinion, that because the right to construct all navigational aids except for wharves has been said to arise from "passive or implied licenses from the public," *Coquille M. & M. Co. v. Johnson,* 52 Or 547, 551, 98 P 132 (1908), the expenditure of money in erecting these structures is not a bar to the power to revoke. 36 Op Atty Gen (Or 1972). The rule of *Heisley* and *Shaw* is a recognition of the fact that generally a licensee's reliance upon the continuing availability of a license is not reasonable absent some affirmative action by the licensor. As indicated in the text, we believe that the riparian owner's reliance upon the longstanding common law rule permitting them to erect navigational structures was reasonable and therefore the rule of *Heisley* and *Shaw* is not controlling here.

estoppel. Generally, equitable estoppel principles are inapplicable against the state because it is thought that the improper acts of government officials should not prevent the government from subsequently correcting that impropriety. *See, Clackamas County v. Emmert,* 14 Or App 493, 513 P2d 532, *rev den* (1973). However, where, as here, reasonable reliance arises from law rather than from improper government action, the state may be estopped. Thus, in *Savage v. City of Salem,* 23 Or 381, 31 P 832 (1893), the Supreme Court held that where a private party erected a water tank on a public street, at his own expense, pursuant to a properly granted license to do so from the city, the city could not thereafter revoke the license without compensating the licensee. *See also, Mead v. Portland,* 45 Or 1, 76 P 347 (1904).

■ Accordingly, we hold that riparian owners who exercised their right to erect navigational structures on state-owned submerged and submersible land prior to the effective date of the lease program, must be permitted to continue their use of such facilities, rent free, for a period of time reasonably necessary to recoup their expenditures, if they have not already done so. Because plaintiffs' entitlement to a remedy, if any, lies in estoppel rather than eminent domain, its quantification is based on investment cost rather than fair market value.

These cases must, therefore, be remanded to the trial court, there being no applicable rule, to determine which, if any, plaintiffs are entitled to such a period of extended rent-free use, and the reasonable length of such period as to each affected facility. On remand, the burden of establishing entitlement to such a period of rent-free use and the appropriate length of such period, rests with the plaintiffs. *See* Comment, 31 Or L Rev 242, 245 (1952). The period of continued use for each facility will be computed by determining the actual investment made in erecting the facility and assigning a dollar value to its periodic use. Thus, as a simple example, a facility which cost

$1,000 to construct and the use of which is worth $500 per year would enjoy a two-year period of rent-free use. If, at the date the lease program rules became effective, the riparian owners had already enjoyed use of the facility for a period of time sufficient to permit recovery of expenditures made, no continued period of rent-free use is appropriate.

In summary, we conclude that the Board is not precluded by existing riparian rights from requiring riparian landowners to lease submerged and submersible lands used for the construction of navigational aids other than wharves. As to all such structures erected after the effective date of the rules, the state may require the execution of leases and the payment of rent. As to such structures erected prior to the rules, riparian landowners must be given a reasonable time to recoup their investment, if that has not already occurred, before rents may be charged.

## IV.  CONSTITUTIONALITY OF THE LEASE PROGRAM

Plaintiffs raise several challenges to the lease program which are based upon both Oregon and United States constitutional grounds. We are persuaded that all of these challenges are without substance.

### Equal Protection

Plaintiffs contend that the leasing program violates the Equal Protection Clauses of the Oregon and United States Constitutions because, by its terms, the program does not require leases from all users of submerged and submersible lands. For example, the state does not require leases for structures legally defined as wharves or for vessels which are temporarily anchored or hove to. Most categories of uses which are exempted from the lease program are excluded because their inclusion might be regarded as constituting a direct burden on interstate commerce and because the program only extends to permanent rather

than transitory occupants of submerged and submersible land. The Board, like the Oregon legislature, might have determined that the construction of wharves, as distinguished from other structures, should be encouraged because they are essential to the movement of goods and passengers in commerce. This determination has reason. In short, we find that all of the exemptions allowed by the Board are supported by a rational basis. *Williamson v. Lee Optical Co.,* 348 US 483, 75 S Ct 461, 99 L Ed 563 (1955); *Clackamas County v. Ague,* 27 Or App 515, 556 P2d 1386 (1976), *rev den* (1977).

### Commerce Clause

██ ██ Plaintiffs contend that the leasing program is void because it places an unreasonable burden on interstate commerce. The program may be invalidated on this ground if it impedes the free physical flow of commerce from state to state, or if it discriminates against interstate commerce vis-a-vis wholly intrastate commerce. *American Can Co. v. OLCC,* 15 Or App 618, 630, 517 P2d 691 (1973), *rev den* (1974). The leasing program does neither of these things. By its terms, it affects interstate and intrastate commerce equally. It does not impede the flow of commerce in any way. It merely exacts payment for the permanent occupation of state property, whether or not such occupation is incident to the flow of commerce. In this respect it is analogous to the imposition of use fees against air carriers for their use of airport facilities.

### Supremacy Clause

██ Plaintiffs also contend that the lease program is inconsistent with federal legislation regulating interstate commerce, particularly the Transportation Act of 1940, 49 USC 901-923, and that it is therefore void under the Supremacy Clause. We find no direct conflicts between the leasing program and that act. Nor do we discern in that act any congressional intention to occupy the field and preempt all state legislation

affecting those who are engaged in interstate commerce.

*Section 2 of the Oregon Admission Act*

Plaintiffs argue that the lease program violates Section 2 of the Oregon Admission Act, which provides:

"* * * All the navigable waters of said State, shall be common highways and forever free, * * * without any tax, duty, impost, or toll therefor."

This provision was intended to preclude the imposition of fees for the privilege of using the state's navigable waters for transportation. *Pollard's Lessee v. Hagan et al.,* 44 US (3 How) 212, 11 L Ed 565 (1845). It does not preclude the state from charging rent for the permanent occupancy of lands underlying navigable waters.

## V. APPLICATION OF THE LEASE PROGRAM TO PLAINTIFF PORT DISTRICTS

Finally, plaintiff port districts contend that, regardless of the validity of the lease program as generally applied, it is invalid as applied to them because the legislature has delegated to the districts the full authority of the state to manage and dispose of the submerged and submersible lands which lie within their boundaries.

The legislature has delegated to the port districts broad powers relating to the management of navigation within their borders. ORS 777.120(1) provides:

"To the full extent the State of Oregon might exercise control or grant to ports the right to exercise control, a port has full control of all bays, rivers and harbors within its limits, and between its limits and the sea. As convenience, requisite or necessary or in the best interests of the maritime shipping and commercial interests of the port, a port may, within its limits:

"(a) Make, change or abolish wharf lines in bays, rivers and harbors.

"(b) By ordinance make, modify or abolish regulations for the use of navigation, or for the placing of

[ 531 ]

obstructions in or the removal of obstructions from bays, rivers and harbors."

Other provisions authorize the ports to acquire property, ORS 777.116, manage and police such property, ORS 777.190, and develop such property, ORS 777.250. ORS ch 778 contains similar provisions relating to the authority of the Port of Portland.

█ █ Notwithstanding the breadth with which the delegations of ORS ch 777 and 778 have been fashioned, port districts have not been given sovereign powers. They are public agencies created to carry out enumerated functions. Their powers are limited to those delegated by the legislature either expressly or by necessary implication. *See, Harrison v. Port of Cascade Locks,* 27 Or App 377, 380, 556 P2d 160 (1976), *rev den* (1977). Where, as here, the legislature has delegated arguably overlapping authority over related subject matter to two agencies, we assume that it intended harmony rather than conflict. Accordingly, we will read the statutory grants together, if possible, in a way which gives effect to each. The grant to the local port districts of the authority to regulate navigation and navigational structures within their boundaries does not necessarily imply a legislative intent to surrender the authority of the state as trustee for the public to charge rental for the use of its lands in doing so. Accordingly, we hold that the lease program is enforceable against the plaintiff port districts to the same extent as it is generally.

Affirmed in part; reversed in part and remanded.