Argued September 28, 1978, reversed and remanded January 15, 1979

BUENA DAIRY ASSOCIATES et al, *Petitioners,*
*v.*
DEPARTMENT OF AGRICULTURE et al,
*Respondents.*
(No. 47, CA 10818)
590 P2d 240

Douglas Millard, Seattle, argued the cause for petitioners. With him on the brief was Dennis W. Skarstad, Portland.

Jan P. Londahl, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton, Tanzer and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

Petitioners seek judicial review of a contested case proceeding before the Department of Agriculture (Department) which resulted in an order denying petitioners' applications for approval of Oregon milk quota transfers executed in 1973.

In order to understand the issues presented, it is necessary to relate some of the historical facts leading up to the dispute presented on this appeal. Most of the facts were set forth in a prehearing order as agreed facts, and will be treated on review as findings of fact supported by substantial evidence. Additional facts, not included among the agreed facts, narrated below are included in the findings and are supported by substantial evidence.

## FACTUAL BACKGROUND

Petitioners Buena Dairy Associates and Carlisle Dairy Associates are limited partnerships organized under the laws of the State of Washington; John Field was the general partner of each. They began business as dairy producers in the Oregon quota pool upon purchase of two Washington farms and production facilities, herds and Oregon milk quota attached thereto. As of late 1972, petitioners were holders of Oregon milk quota[1] (pursuant to ORS chapter 583 and OAR chapter 603, division 65) acquired by purchase of cows with quota and by earning additional quota through delivered milk production[2] following the purchases.

In late September, 1972, Mr. Field telephoned Mr. Hobson, Administrator of the Oregon Milk Stabilization Divison of Oregon Department of Agriculture concerning petitioners' desire to get out of the milk

---

[1] A dairy producer's quota represents the amount of milk, expressed in pounds, he is obligated to produce and deliver each day and for which he is entitled to receive a premium price.

[2] OAR 603-65-032.

production business by disposing of their herds, Oregon milk quota and farms. Mr. Hobson advised that the cows and quota could be transferred by lease or sale and that any lease form to be used should be approved by the Department.

In October, 1972, Field, Hobson and other interested parties met in Tumwater, Washington, to discuss petitioners' proposal to lease their herds and quota to the Professional Agricultural Marketing Corporation (PAMCO), an Idaho milk producer, and the farms and production facilities to Sanitary Cloverleaf, Inc., (Cloverleaf) a Washington dairy handler.[3] At that meeting, Mr. Hobson indicated, among other things, that: (a) quota could be sold or leased only with the herd to which it attached; (b) PAMCO could acquire a leasehold interest in the herds and quota and "consign" to petitioners its interest in the herds for sale or assignment to Cloverleaf; (c) such form of quota transfer was basically the same as frequently approved by the Department pursuant to the auction sale of herds and quota; (d) transfer of federal "base"[4] within the Oregon-Washington Milk Order No. 124 was not essential to a valid quota transfer (quota transfers had been approved without transferring the federal base); (e) in any case, the Administrator of the

---

[3] A "handler" is defined in ORS 583.007(5), and in general includes one who processes milk, or who serves as a marketing agent for producers.

[4] The transfer of the federal base ultimately became irrelevant. Stated generally, federal base means a quantity of milk expressed in pounds per day as computed by the administrator of the Federal Milk Marketing Order effective in the area in which the producer's farms lie. The base, which is recomputed each year, equals the total pounds of milk delivered daily from each producer's farm for a period of not less that 120 days during the 5-month period of August through December divided by the number of days it took to produce that milk. 7 CFR § 1124.65.

All Class A Milk producers in Oregon automatically are participants in the Oregon-Washington Federal Milk Marketing Order which was established pursuant to 7 USC 601-674 (1976) to regulate the handling of milk in this marketing area. However, a producer who ceases production for 45 days loses his base until he recommences production. Once a producer is assigned a daily base, he is assured of receiving a uniform base price for all milk produced up to that base amount. For milk produced in excess of his base he will receive a uniform "excess" price which is somewhat lower than the base price.

federal milk order normally approved base transfers where the Oregon Milk Stabilization Division approved the transfer of quota; (f) petitioners' objective of transferring their quota to PAMCO and ultimately transferring their herds to Cloverleaf could be accomplished if done in conformance with the above procedures; and (g) petitioners' attorney should prepare proposed lease forms to conform to these terms for quota transfer, and send two copies of them to Mr. Hobson.

Thereafter, a proposed lease form covering the herds and quota was prepared and submitted to Mr. Hobson on October 18; the lease form was approved by the Department. Shortly thereafter petitioners were advised that the Federal Administrator would not recognize the transfer of the federal base, and so notified Mr. Hobson, who raised no objection to the proposed quota transfer on that account. He did say, however, that it would have some economic impact on the Oregon pool. He suggested to Mr. Field that he consider transferring the quota to existing Oregon quota-holding producers rather than to PAMCO because transfers to existing quota holders would provide a net economic advantage to the Oregon quota pool which would compensate for the lapse of petitioners' federal base.

As a result of Mr. Hobson's suggestion, petitioners withdrew from their proposed lease transaction with PAMCO and agreed to make the transfer to existing Oregon pool producers. At his further suggestion, petitioners appointed an authorized person recommended by Mr. Hobson to handle the leases so that the distribution of the quota would be uniform and controlled.

On November 17, petitioners executed leases of their farms and production facilities to Cloverleaf, effective December 1, 1972. On December 11, 1972, Messrs. Field and Hobson met in Salem to discuss the process of transferring the quota to existing pool

producers, at which time a revised form of the lease to be used was delivered to Mr. Hobson. Although the petitioners had successfully arranged for transfer of most of their quota by December 1, 1972, and had delivered possession of their farms to Cloverleaf on that date, Mr. Hobson said he wanted to meet with his Production Advisory Board[5] on the 12th before proceeding. On December 14, Mr. Hobson wrote petitioners that the transfer of quota without the federal base "seems prohibitive."

On December 20, 1972, petitioners submitted a written request for production exemption for the full months of December, 1972, and January, 1973, in order to prevent the lapse of their quota by virtue of their failure to produce milk as of December 1,[6] when they turned over their production facilities to Cloverleaf. Petitioners were informed by the Department on February 14, 1973, that the extension had been denied and that their quota had been decreased by 9,000 pounds.

On February 21, 1973, counsel for petitioners met with counsel for the Department in an attempt to settle and resolve the dilemma. That meeting resulted in an administrative determination that petitioners could transfer the full amount of their quota in the manner and subject to the terms set forth in the Department's letter of February 23, 1973, to petitioners, which, so far as relevant, provided:

"* * * * *

"The reliance by your clients upon information that could reasonably be construed as they did, whether such

---

[5] The Producer Advisory Board is a group of producers, largely representative of milk producer groups throughout the state, to which the Director of Milk Stabilization may submit matters for members' opinions or advice. Petitioners were not invited to attend that meeting.

[6] Petitioners had ceased producing milk as of December 1, by virtue of which fact their daily average production during the four low months of the calendar years would be substantially reduced, thereby resulting in a downward adjustment of their quota, ORS 583.515, OAR 603-65-025, unless an exemption of low production months is granted. OAR 603-65-025.

construction was erroneous or otherwise, and the unique method of transfers contemplated, has resulted in the department considering your requested exemption as follows:

"(1) Your clients' quota adjustment shall be recalculated excluding the month of December, 1972, from the four low months of production;

"(2) Your clients' adjusted quota established February 1, 1973, shall remain unaffected for a period of 90 days from the date hereof, subject to the following conditions;

"(a) Within such time period, your clients submit, and obtain departmental approval of, applications for transfer of the involved quotas to qualified quota-holding producers, such to be performed in accordance with Oregon regulations governing such transfers;

"(b) Obtain and, at the same time of submitting the data described in (a) above, submit to the department written consents or approvals for any contemplated quota transfers executed by any lien claimants against the quotas and/or herds to which the quotas are attached; and

"(c) Apply for transfer of base under the provisions of federal Milk Marketing Order No. 124 (Oregon-Washington Order), which application may be made in the normal manner by submission through the offices of this department for transmission to the federal authority.

"(3) Should the quota transfers be completed in accordance with the above, and within the time period specified, the time period necessitated for such transfers will be excluded from the bases for determining the February 1, 1974, quota adjustment;

"(4) Should the quota transfers not be completed within the time period specified, for any reason, the provisions of paragraphs (2) and (3) shall be of no effect.

"* * * * *"

Petitioners accepted the terms of this letter, which both parties characterize as a settlement agreement, and submitted executed Quota Transfer Applications and executed lease agreements involving cows and quota to the Department within the stipulated time.

On June 22, 1973, Mr. Hobson wrote to Mr. Field advising of the Department's denial of quota transfers. In subsequent legal proceedings, we held that petitioners were entitled to a contested case hearing, *Buena Dairy v. Dept. of Agric.,* 25 Or App 381, 549 P2d 689 (1976), which they have now had and which they ask to be judicially reviewed.

While the facts are somewhat involved, the parties agree that the ultimate question is whether petitioners complied substantially with the terms of the letter of February 23, 1973, quoted above, which was prepared as a result of an administrative determination that petitioners could transfer the full amount of their quota in the manner and subject to the terms set forth in that letter.

The hearing officer's[7] Ultimate Finding of Fact was that the petitioners had failed to comply with the terms for approval of their proposed quota transfers and failed to justify their noncompliance. This finding is assigned as error on appeal, along with challenges to certain Findings of Fact and Conclusions of Law.

At the heart of the dispute is the issue of whether petitioners' proposed transfers of their quotas complied with the Department's regulations within the meaning of paragraph (2)(a) of the February 23 letter, and we will discuss that issue first.

## I. COMPLIANCE WITH REGULATIONS

■ Before we can discuss this question, we must address the Department's Conclusion of Law (1)[8] to

---

[7] For the sake of convenience, we will refer to the person who conducted the contested case hearing as the "hearing officer," as if he were an independent referee or master, recognizing that he was not, but rather was an employee of the Department whose function was to make a record, proposed findings of fact and conclusions of law which apparently were adopted by the Department.

[8] Conclusion of Law (1) states:

"(1) The Pre Hearing Order entered in this matter superceded the Notice of Hearing in respect to the matters mentioned in both

which petitioners assign error. By way of background, in the prehearing order in which most of the historical facts were agreed upon, the respondent[9] set forth among its contentions that the February 23, 1973 letter "constituted a settlement agreement of all prior disputes and claims of the petitioners that existed prior to such date, and therefore precludes any consideration of events or documents relating to the proposed quota transfers prior to such date."

Notwithstanding that contention, the respondent agreed that the only issue of law was: "Whether petitioners complied with the Department's standards for quota transfer pursuant to the Department's correspondence to petitioners, agency practice and applicable administrative regulations."

It seems apparent that the stipulated issue of law, in the context of the agreed facts, necessarily involved matters and events which occurred prior to the February 23 letter. The hearing officer, however, concluded as a matter of law that such matters and events "are considered in respect to the Petitioners' abilities to comply with the accepted criteria for their proposed quota transfers." In overruling the respondent's continuing objection to evidence falling into that category, the hearing officer stated that it may be relevant "concerning departmental conduct."

---

documents. The Pre Hearing Order did not preclude the parties from expanding their contentions or offering additional evidence. However, the Presiding Officer is entitled to consider the Pre Hearing Order as evidencing the principal contentions and issues in this matter, and to only consider any additional contentions or evidence that are germane to these principal matters. This is the utilization of the Pre Hearing Order in this instance, and the Petitioners' contentions and evidence related to events preceding the February 23 letter agreement or to events subsequent to the June 23 disapproval letter of the Department are considered in respect to the Petitioners' abilities to comply with the accepted criteria for their proposed quota transfers."

[9] For purposes of discussing the Department's adversary position in the contested case hearing we will refer to the Department as the "respondent."

While it is not clear what the hearing officer intended by his Conclusion of Law (1), if it is intended to preclude consideration of the factual setting in which the February 23 letter was written, or the construction of that letter in light of the historical facts, the conclusion is in error. It is apparent from the Findings of Fact that the hearing officer did not so limit the evidence.[10] Accordingly, we review the Findings as if all of that evidence were admitteu for any relevant purpose.

■ Procedures for the transfer of quotas are, by statute (ORS 583.515(2)), left to the Department, which, in turn, has adopted regulations. OAR 603-65-005 to 603-65-085. OAR 603-65-005(1) provides:

" 'Quota' shall be deemed to be a market right which carries with it certain obligations on behalf of the holder

---

[10] For example, Finding of Fact (12):

"(12) Neither the activities or comments of the departmental staff prior to the February 23 agreement, nor the activities or comments of the departmental staff subsequent to the Department's disapproval of the submitted quota transfers in June 1973, indicate that the Petitioners were denied an opportunity to comply with the terms of the February 23 agreement and thereby obtain departmental approval of the proposed quota transfers, to wit: there was no prior assurances or tentative approvals given to the Petitioners that the Department would ultimately approve their proposed quota transfers; Petitioners' initial consideration to lease to 'PAMCO' was not frustrated by any departmental conduct nor did failure to continue negotiations with 'PAMCO' affect the Petitioners' efforts to subsequently negotiate with the eventual proposed lessees; the Department did not previously indicate to the Petitioners that quota could be leased independent of the cows to which it attached; prior discussions concerning transfers of federal 'base' associated with the cows did not prevent the Petitioners from ultimately requesting the federal Milk Market Administrator to transfer the base; discussions with or comments made by members of the Department's Quota Advisory Committee were not relied upon by the Department in considering the Petitioners' requested approvals; any prior misinformation of the departmental staff concerning the Petitioner's relationships with Sanitary Cloverleaf was not considered by the Department after the February 23 agreement; and other prior or subsequent quota transfers or quota exemptions approved by the Department for other milk producers were not under identical or similar circumstances as those surrounding the Petitioners and do not indicate any variation in application of the administrative rules by the Department in its consideration of the Petitioners' proposed quota transfers."

thereof, and which cannot be purchased or sold as a commodity."

Under OAR 603-65-035(6), a transfer of quota "as herein provided for shall be of the entire quota with the entire herd to one or more persons." It is apparent from the regulations as a whole that it is intended that a given quota be attached to a herd and that it not be treated as a free-floating commodity separate from a herd which has the capacity to produce the quota for the market. There is no magic, however, in its attachment to a particular herd; it may become attached to a substitute herd which is able to produce the quota.

■ Whether petitioners' proposed transfer of quota complied with the regulations depends on the Department's interpretation of those regulations, to which interpretation courts tend to give deference where, as here, there is an element of expertise involved. *Carnation Co. v. Dept. of Agriculture,* 7 Or App 223, 488 P2d 1385 (1971), *rev den* (1972). It is conceded that the Department has interpreted the regulations to permit the transfer of quota where the transferee did not want the herd and, at the time of the transfer of the quota and herd to the original transferee, the herd was, by prearranged but separate agreement, transferred to a third person. Further, the Department has interpreted its regulations as not requiring the original transferee under such an arrangement to take physical possession of the herd, even for an instant; it was enough if the original instrument of transfer gave the transferee an interest in the herd which he immediately transferred.

Following this line of interpretation, the Department approved the form of petitioners' original proposed instrument of transfer, a lease, to PAMCO, although that transaction was abandoned at the request of the Department because the Department preferred the quota to be transferred to a transferee, or group of transferees, who already produced milk for the Oregon pool, rather than PAMCO which did not.

Without abandoning that interpretation of its regulations, the Department denied the subsequent transfers, arranged by petitioners, to Oregon producers, primarily because it contended that those transfers were different from the proposed PAMCO lease, and therefore violated the regulations. An analysis of the two transactions is necessary.

A. PAMCO Lease

This lease covered both the quota and the herd. However, it expressly provided:

> "3. *Consignment of Leasehold Interest in Herd.* Lessee shall consign to Lessor, for sale to Cloverleaf Farms, Inc., for the price of One Dollar ($1.00), Lessee's leasehold interest in the herd. Said leasehold interest shall expire or terminate upon the expiration or termination of this lease."

Not only was it clear that the lessee was required to dispose of its interest in the herd, which was to be leased by the lessor to Cloverleaf for a lease term coextensive with the PAMCO lease, but, under other express provisions, it was clear that under no circumstances would the lessee reacquire an interest in the herd. To the contrary, the lease expressly provided that in the event of termination of the Cloverleaf lease, lessor could terminate the PAMCO lease and reacquire the quota, notwithstanding its attachment to a substitute herd, and the quota would thereupon attach to the herd covered initially by the PAMCO lease. Rental was based exclusively on the amount of milk sold under the quota.

The overall format of the transaction was clear: petitioners wanted to get out of the milk production business, had leased their farm and other production facilities to Cloverleaf, and agreed to lease to Cloverleaf their herds which remained on the farms. If Cloverleaf defaulted and petitioners reacquired the farms and herds, the PAMCO lease could be terminated, thereby reuniting the production facilities, including the herds, with the quota.

[ 46 ]

## B. The Disapproved Transactions

■ After the PAMCO transaction was abandoned in favor of transfers to existing Oregon pool producers, a series of identical leases was executed, each one covering a portion of the quota and a corresponding portion of the herd. The overall format of the transactions was identical to the PAMCO lease. The respondent erroneously contends, however, that the provision relating to the "consignment" of the herd by the lessee to the lessor was sufficiently different from the PAMCO lease that the new transactions violated the Department's regulations. That lease provision stated:

> "4. *Consignment of Leasehold Interest in Herd.* Lessee hereby consigns to Lessor, for sale to Sanitary Cloverleaf Farms, Inc., for the price of One Dollar ($1.00), Lessee's leasehold interest in the herd. Upon such sale to Sanitary Cloverleaf Farms, Inc., Lessee shall have no further rights or obligations relating to the herd. Said leasehold interest shall expire or terminate upon the expiration or termination of this lease."

The respondent's principal contention is that under the PAMCO lease a separate document would have been required to "consign" the herd to petitioners, whereas the final lease form constituted a unitary transaction under which the herd was leased, and in the same instrument consigned back to the lessor. The former complied with the regulations because, it is contended, PAMCO could have changed its mind, but the latter did not comply because the lessee could not change its mind. Such an attempted distinction is not well-founded—PAMCO was legally obligated to "consign" the herd to the lessor for "sale" to Cloverleaf. The respondent also contends that the final lease form violated the regulations because it did not "vest" any interest in the herd in the lessee, however momentary, whereas the PAMCO lease did do so. As we view both transactions, neither transferred a meaningful leasehold interest in the herd to the lessee because in neither case was the lessee entitled or expected to take possession of the herd. However that interest might be

[ 47 ]

characterized, it was of the same quality in both instances.

The hearing officer incorporated the respondent's contention in his Conclusion of Law (8), and we sustain plaintiff's assignment of error thereto. We do not hold that the Department could not interpret its regulations to prohibit the PAMCO type of transaction, but only that the Department's attempt to distinguish between that transaction and the final transactions in interpreting its regulations was arbitrary and capricious: if the regulations permit one, they cannot reasonably prohibit the other. If there is any distinction, it is one without a difference.

C. Identification of the Herd

The hearing officer also concluded that petitioners had not complied with the Department's regulations because he found correctly that they had not specifically identified each cow covered by each of the leases. This conclusion is based on the hearing officer's interpretation of OAR 603-65-035(5) at the time of the hearing, and ignores the prior interpretation of the Department. That regulation provides:

> "Copies of any and all documents evidencing the sale or lease upon which the transfer is to be made, shall be supplied to the department along with said quota transfer affidavit, including, but not limited to leases, contracts of sale, mortgages, bills of sale, and identification of the cows involved in the quota transfer."

The most reasonable construction of the regulation, which is similar to the statute involved in *Stanfill v. Real Estate Division,* 35 Or App 549, 581 P2d 980 (1978), is that any of the listed documents which are, in fact, used in connection with the transfer must be supplied to the Department, but not that each of the documents must be used in each transfer of quota. If, however, the Department had construed it consistently to require cow identification in every quota transfer, we would defer to that permissible interpretation. *Schoen v. University of Oregon,* 21 Or App 494, 535 P2d 1378 (1975).

[ 48 ]

In this case, the Department wrote petitioners on April 26, 1973,[11] acknowledging receipt of their request for transfer of quota, and stating that "permission is herewith granted" subject to certain conditions, including giving the Department the "number of cows" along with the "amount of quota." Each of the leases gave the number of cows, but did not otherwise identify them with specificity.

Not only did the hearing officer ignore that letter interpreting the regulation to mean that giving the number of cows was all that was required, but he found as a fact that petitioners did not offer to supply specific cow identification,[12] which he concluded was required. That finding has no basis in the record. The only evidence in the record on this point is uncontradicted testimony of petitioners that the matter of cow identification had been discussed with the Department in May of 1973 when the executed leases were delivered, at which time the Department was advised that petitioners had identification numbers and could provide them if desired. However, the Department responded that it would not be necessary to go through that "ritual" in connection with these transfers.[13]

---

[11] The letter of April 26, 1973, imposed some more restrictive conditions on the transfer than did the letter of February 23, 1973; petitioners objected to them, and they are not in issue in this proceeding.

[12] There is no provision in any of the Department's regulations requiring that "numbers," brands or other means of cow identification be kept at all. The record indicates that producers with large herds often use identifying numbers on chains placed around a cow's neck to assist in proper herd management by keeping records relating to a cow's age, health, productivity, and the like, and are in no way analogous to serial numbers used for registration purposes. Producers with small herds are often able to keep track of each cow without the use of identifying numbers. When a cow is culled from a herd, its neck chain and number are commonly removed and reassigned to a new cow. The Department takes no part in this process.

[13] That it would have been a ritual in this transaction is clear from the record in light of the known fact that none of the lessees wanted the cows, would not have possession of them at any time, and did not care which cows might be attributed to each lease. The entire herd was in the possession of Cloverleaf, and had been since before December 1, 1972, and would continue in Cloverleaf's possession after the quota leases were approved.

[ 49 ]

The record, therefore, supports the conclusion that the Department did not interpret its regulation as requiring cow identification in the circumstances involved in this case, but only required that the number of cows involved in each lease be stated.

For the foregoing reasons, the hearing officer's conclusion of law that petitioners violated the Department's regulations by not identifying specifically each cow covered by each of the leases is erroneous.

■ While it is true that in its letter of June 22, 1973, denying the application for transfer of quota, the Department stated as a reason for the denial the fact that the leases did not identify the cows involved, the hearing officer did not base his conclusion on a Departmental interpretation by virtue of the denial letter. If reliance were placed on that letter as a Departmental interpretation, we would be compelled to conclude that the Department would be estoppped to make a last minute change in the applicable law where the petitioners had relied reasonably on the Department's prior interpretation thereof. *Brusco Towboat v. State Land Bd.*, 30 Or App 509, 528, 567 P2d 1037 (1977); *Belton v. Buesing,* 240 Or 399, 402 P2d 98 (1965).

■ The related contention and finding that the herds were in the possession of Cloverleaf at the time the request for transfer of quota was made is not relevant to petitioners' compliance with the regulations within the meaning of the February 23 letter. At the time of that letter, the herds were in Cloverleaf's possession and everyone, including the Department, knew they would remain there. The finding, therefore, does not support the conclusion of a violation of the regulations.

■ We conclude, therefore, that petitioners complied substantially with paragraph (2)(a) of the letter of February 23, 1973.

## II. CONSENT OF LIEN CLAIMANTS

The letter of February 23, 1973, set forth the further condition in paragraph 2(b)ʼ that petitioners submit written consents or approvals of the quota transfers executed by any lien claimants against the quota and/or herds to which the quotas were attached. At the time of the letter, there were two holders of security interests, and within the required time a written consent from one was submitted to the Department, and an oral consent from the other was given to the Department; the latter's security interest was extinguished prior to the expiration of the 90-day period specified in the letter. However, the fact of extinguishment apparently was not communicated to the Department. In denying the application for transfer, the Department did not give as a reason the failure to obtain the written consent of a lien claimant, nor did the notice of hearing. Further, no issue is made of this point in the prehearing order, and none of the agreed facts relate to it.

Although petitioners contended in the prehearing order that they complied with the terms of the February 23 letter, they had no reason to think that the written consent of the lien claimant was an issue in those proceedings, particularly in light of its extinguishment and the fact that it had not been an issue previously. As a result, the record is sparse on this subject, but what evidence there is indicates that the lien had been extinguished prior to the expiration of the 90-day period. Accordingly, the finding that the "cows and quota were subject to lien claims of two creditors" is not supported by the evidence. But even if it were, the conclusion of law, purportedly based theron, is not. That conclusion is not that petitioners did not comply with condition 2(b) in the February 23 letter specifically relating to lien claimants, but rather that petitioners failed to comply with OAR 603-65-035(5) (discussed above in connection with the identification of the herd). It appears that the hearing officer

realized that paragraph 2(b) of the February 23 letter was not properly an issue, and attempted to treat the issue as encompassed by the general requirement contained in paragraph 2(a) relating to compliance with Department regulations. We conclude that the hearing officer was in error in taking this approach, and hold that the issue was not properly involved in this proceeding.

\* \* \* \* \*

It follows from what we have said that the Department erred in finding and concluding that petitioners did not comply with the Department's regulations within the meaning of the February 23, 1973 letter, and that the Department erred in denying petitioners' application for transfer of their quotas.

Reversed and remanded.